# ÆTNA LIFE INSURANCE COMPANY *v.* WARD.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEW JERSEY.

No. 1388. Argued March 4, 5, 1891.— Decided April 27, 1891.

When the trial court has given the substance of a requested charge to the jury, it is under no obligation to repeat it in the requested language.

When evidence offered by one party at the trial tends to discredit that offered by the other, it is for the jury to weigh and decide, under proper instructions from the court.

In an action to recover on a policy of life insurance where the defence is that the death was caused by intemperance, which by the terms of the policy exempted the company from liability, it is no error in the court to instruct the jury that they are at liberty to reject the diagnosis of a

medical witness offered on behalf of the defendant, if they have no con-
fidence in his skill and experience, the same having been assailed by the
plaintiff's testimony.

An instruction to the jury in such case that the evidence of the defence
need not be so convincing as to be beyond reasonable doubt, but that the
weight of testimony must decidedly preponderate on the side of the de-
fendant is not error, when the two clauses are taken together and in con-
nection with the whole tenor and effect of the charge, although the
phrase " decidedly preponderate " is not technically exact with reference
to the weight and quantity of evidence necessary to justify a verdict in
civil cases.

In a case like this, this court is confined to the consideration of exceptions
taken at the trial, to the admission or rejection of evidence and to the
charge of the court and its refusals to charge; and it has no concern
with questions of fact or with the weight to be given to evidence which
was properly admitted.

THIS was an action on a policy of life insurance. There
have been three trials of it by jury, in each of which there
has been a verdict in favor of the plaintiff, for the full amount
of the policy. The case was before the court at October term,
1887, *Ætna Life Ins. Co.* v. *Davey*, 123 U. S. 739, where the
judgment of the court below on the first verdict was reversed
and a new trial ordered because of certain erroneous instruc-
tions to the jury in the charge of the court. The proceedings
in the court below in relation to the first and second trials are
reported in 20 Fed. Rep. 482; 20 Fed. Rep. 494; 38 Fed. Rep.
650, and 40 Fed. Rep. 911.

The case as now presented is as follows : The defendant in
error, Ada Ward, formerly Ada Davey, was the wife of Wil-
liam A. Davey, of Jersey City, New Jersey, and the benefi-
ciary named in a policy of life insurance issued by the plaintiff
in error on the life of Mr. Davey, for the sum of $10,000, dated
July 16, 1879. Mr. Davey died on the 6th of August, 1881, at
Alexandria Bay, New York, and within ninety days there-
after, to wit, August 16, 1881, his widow gave to the company
due notice and proofs of his death, as required by the terms
of the policy, and demanded payment of the amount named
therein, which was refused, and thereupon this action was
brought. So far as the present status of the case is concerned,
the defence to the action is, that there was a breach of that

condition in the policy, on the part of Mr. Davey, which provided that if he "shall become so far intemperate as to impair his health or induce delirium tremens," then the policy should become null and void.

On the trial of the case before Judge Green and a jury, the plaintiff, to maintain the issue on her part, introduced evidence showing the death of Mr. Davey, and also certain papers constituting proofs of loss, including the certificate of death of the deceased by Dr. Rae, the family physician. In this certificate the following questions and answers occur: "3. Was his last illness occasioned, or had his general health been impaired, by any pernicious habits? A. He was in the habit of using stimulants and a great deal of tobacco; probably they impaired his health." "5. Was his health impaired by intemperance? A. See answer to 3. B. Was his death caused, directly or indirectly, from intemperance? See answer to 3." The plaintiff thereupon rested her case.

The defendant introduced the evidence of a large number of witnesses to prove the breach of the above-mentioned condition in the policy. All of them were associated with him whilst he was at Alexandria Bay, most of them boatmen engaged in rowing on the St. Lawrence River, clerks and keepers of hotels, a bell-boy, the physician who attended him in his last illness, and two medical experts. The evidence of these witnesses was to the following effect: In the evening of the 24th of July, 1881, Mr. Davey arrived at Alexandria Bay on the St. Lawrence River, on his annual fishing excursion to that place, and put up at the Crossman House. He seemed at that time to be in delicate health, and one of the witnesses, at least, testified that he shuffled in his walk while going up to the hotel. From that date up until Monday, August the 1st, William White, the boatman, testifies that the deceased was on the river every day with him, from 8 or 9 A.M. until the middle of the afternoon or in the evening, and that while on the river the deceased drank about a quart of brandy daily. In addition thereto, according to the testimony of the bell-boy at the hotel, the saloon-keeper and several boatmen, he drank at the bar of the Crossman House every evening, quite freely, and

sometimes in the morning before breakfast; and frequently went across the river to Lockport and to another place known as the Island View House, kept by one Theodore Lear, and drank heavily of brandy at both places, as testified to by the respective keepers and bar-tenders of those hotels. The bell-boy at the Crossman House testifies that very often during the period mentioned he had several drinks sent to his room in the evening and sometimes in the morning; and that on the afternoon of Tuesday, August 2, at the request of Mr. Davey, he carried two quart bottles of liquor to his room — one of brandy or whiskey and the other of gin. On going to his room on the morning of Wednesday, the 3d of August, the bell-boy says those two bottles were empty and Mr. Davey was sitting in bed in a very weak and nervous condition, his clothing and the bed clothing spattered with blood, and there was considerable blood in the slop-jar beside the bed. The bell-boy notified the proprietor of the hotel of the affair, and he, together with Frank Bruce, a clerk at the hotel, (who was then studying medicine and has since graduated in that science, and is now a practising physician,) went to Davey's room. They at once sent for Dr. L. C. Watson, a practising physician at that place. Dr. Watson testified that Davey said to him that he had been cautioned by his family physician that if he persisted in "having these times," he would have hemorrhage of the stomach, which would probably kill him. And then looking at the blood, he said: "There is the blood, and I suppose it is all up with me now."

Bruce and Dale also testified that Davey complained of seeing pitch, fire and smoke in the room when none existed; and Bruce further testified that Davey imagined that somebody was trying to saw off his limbs, and that there was a heavy pipe lying across his chest, and exhibited various other symptoms usual in cases of acute alcoholism or delirium tremens. At times he was quite violent, called continually for liquor, but by and by calmed down very materially, so that by the time his family physician, Dr. Rae, and Mrs. Davey arrived he had sunk into a state of exhaustion and quietude.

The evidence on the part of the defence tended to show

that Davey's death was superinduced by an excessive use of ardent spirits, which brought on delirium tremens; and the evidence of two physicians who were examined as experts was to the effect that the symptoms described indicated that Mr. Davey suffered from delirium tremens, and that any one drinking brandy to the extent he did, as testified to by the witnesses for the defence, would greatly impair his health and bring about death.

The evidence in rebuttal was given by witnesses who had been acquaintances, neighbors, business associates, intimate friends, and members of his family, who stated that they were familiar with his habits of life. Their evidence was to the effect that no sign of intoxication or intemperate use of liquor was ever seen by them during a period of many years, immediately preceding his death, though all spoke of his constant use, in a moderate degree, of alcoholic liquors. The result is that the evidence of witnesses who were associated with the deceased at Alexandria Bay is inconsistent with the idea of a moderate use of liquor by him,:or with any idea other than that his last illness and death were due to excessive drinking of alcoholic liquors; whilst on the other hand the evidence of his neighbors, friends, business associates and family was, though in one sense, of a negative character, to the effect that his whole course of conduct and habits were at variance with the course of life pursued by him just before his death, as testified to by the witnesses for the defence. One witness only, for the plaintiff, a Mr. Mattoon, an elderly gentleman, saw Davey at Alexandria Bay in the summer of 1881, before he was taken violently ill. He did not stop at the same hotel as Davey, but saw him five or six times for short periods of thirty minutes or more, between the date of his arrival, July 23, and July 31, at all of which times he was apparently sober.

Dr. Rae, the family physician, who furnished the certificate of death, arrived at Alexandria Bay about noon on Friday the 4th, and left about 3 o'clock in the afternoon of the following day, before Davey died. At the trial, among other things, he testified that when he arrived he found Davey in a dying condition; but when questioned as to the cause of death he ad-

hered to the statements made in the certificate of death furnished by him, testifying on this point as follows:

"You certified that he was in the habit of using stimulants? A. Yes, sir. Q. And that was true? A. Yes, sir. Q. And by stimulants you wish us to understand alcoholic liquor? A. Yes, sir. Q. And when you say probably they impaired his health, that was your opinion at that time? A. Yes, sir. Q. You don't deny that it was your judgment that they impaired his health? A. They mean tobacco and liquor together. Q. I ask you about stimulants, nothing about tobacco. You don't deny that in your judgment they impaired his health? A. I said they probably did. Q. I don't ask you what you said in your certificate, and if you will pay attention to the question we will get along faster. You don't deny that it is your judgment that they impaired his health, do you? A. No, sir. Q. You adhere to the statements that are contained in the certificate? A. Yes, sir; as far as I know."

There was also some evidence given by Mrs. Davey, over the objections of the defendant, to the effect that Mr. Davey took stimulants upon the advice of a Dr. Kellerman of New York city, since deceased, quite frequently during the day; and that, for several years previous to his death, Mr. Davey had been suffering from lung trouble, at several times having had hemorrhages.

At the close of the testimony, which was quite voluminous, the defendant requested the court to direct the jury to bring in a verdict in its favor, but this the court refused to do, and the defendant excepted. The jury returned a verdict in favor of the plaintiff for the full amount of the policy, and, judgment having been entered on the verdict, the defendant prosecuted this writ of error.

*Mr. Wayne McVeagh* and *Mr. Theron G. Strong* for plaintiff in error.

*Mr. John Linn* and *Mr. Cortlandt Parker* for defendant in error.

Mr. Justice Lamar delivered the opinion

The chief difficulty in the way of a connected review of this case lies in the great number of errors assigned by the plaintiff in error, embracing exceptions to the admission of evidence during the progress of the trial, and to the charge of the court, and also to refusals to charge as requested. They are sixty-six in number, covering ten pages of the printed record. They are, however, reduced by the brief of counsel to forty-five specifications grouped under twelve different headings. As we cannot discuss them singly, in the order in which they are presented, without being involved in an entanglement of multiform and somewhat inconsistent propositions, we will endeavor to dispose of the most material points under our own arrangement.

When the case was here before, speaking of the clause in the policy which is now in dispute, we said: "If the substantial cause of the death of the insured was an excessive use of alcoholic stimulants, not taken in good faith for medical purposes or under medical advice, his health was impaired by intemperance, within the meaning of the words 'so far intemperate as to impair his health,' although he may not have had delirium tremens, and although, previously to his last illness, he had not indulged in strong drink for such a long period of time or so frequently as to become habitually intemperate. Whether death was so caused is a matter to be determined by the jury under all the evidence." 123 U. S. 743, 744. Accordingly, on this trial of the case, to rebut the evidence offered by the defence, tending to show an excessive use of liquors on the part of the deceased, the plaintiff sought to show that the deceased had taken stimulants, at various times, sometimes in considerable quantities, upon the advice of his physician. The first, second and third specifications of error are that the court erred in allowing Mrs. Davey to answer certain questions put to her with reference to the fact of the deceased having taken stimulants upon the advice of his physician. As the questions were in proper form, and as such evidence was germane to the issue, there was no error in allowing her to answer them. It was shown that Dr. Kellerman, who prescribed stimulants for Mr. Davey during his lifetime, was dead at the time of the

trial, and, as Mrs. Davey testified that she was present, when the prescription was given and afterwards prepared the stimulants for her husband, in accordance with that prescription, the evidence was properly admitted.

Without referring to the other exceptions relating to the evidence, none of which we think were well taken, we will proceed to the consideration of the specifications of error which relate to the instructions given and to those refused. The first specification of error, which we think proper to notice, is that the court erred in refusing to give the following instruction : " To establish the breach of the condition of the policy, ' become so far intemperate as to impair his health,' it is not necessary to satisfy the jury that his health was impaired to the extent of causing death." It is our opinion that this request was properly refused. The court had already given the substance of it to the jury, as a fundamental proposition underlying the entire body of the charge, in the following terms : " But this contract was made by the company and Mr. Davey upon certain expressed conditions, seven in all, which in clear and positive language limit in various ways the rights and obligations of both the contracting parties. It will be necessary for you, gentlemen, to consider, however, only one, or, to speak more accurately, only part of one of these conditions. It is the third, as you will find them numbered in the body of the policy or contract, which you will have before you. In that condition you will find these words : ' If the insured shall become so far intemperate as to impair his health or induce delirium tremens, this policy or contract shall become null and void.' In other words, so far as this suit is concerned, the contract between the Ætna Life Insurance Company and Mr. Davey was this : For the consideration of the sum of $233.60, to be paid by Mr. Davey to the insurance company annually during his life, that company insured his life for ten thousand dollars, upon the expressed condition, nevertheless, that if Mr. Davey became so far intemperate as to impair his health, or became so far intemperate as to induce delirium tremens, then and in the case of the happening of either of these alternatives the contract became null and void, and the company would be

liable no longer under it." "If the company have satisfied you that he has done either one or the other — that he has become so far intemperate as to impair his health, or by his intemperance has induced delirium tremens — a complete defence to this suit has been made, and your verdict would be for the defendant." "I think it proper, before I call your attention to the evidence which has been given, and which I shall do very briefly, to explain as clearly as I can what is meant by the words, 'so far intemperate as to impair health or induce delirium tremens.'" "Mr. Davey agrees that he will not become so far intemperate as what? Why, become so far intemperate as to impair his health, or so far intemperate as to induce delirium tremens. If impairment of health or if delirium tremens was caused by or followed his intemperance, then the degree of intemperance which has been forbidden by this condition has been reached. Thus you will perceive that if a single debauch, lasting for a period of a few days, or it may be a single day only, results in the impairment of health or in delirium tremens, it will be clearly that intemperance which is positively forbidden." After this full and explicit instruction there was certainly no error in refusing the request to repeat it in different language.

Five of the exceptions relate to the charge given by the court with reference to the liquor taken by the deceased on the advice of his physician, and four relate to the refusal of the court to charge as requested by the plaintiff in error on the same point. Those parts of the charge that are excepted to are as follows: "If the jury should believe that the efficient controlling cause of the death of William A. Davey was the excessive and continuous use of strong drinks for several days and nights immediately preceding his death, yet if they believe that it was taken in good faith for medical purposes under medical advice, such use was not a violation of that condition of the policy which declares that it shall be null and void if he shall become so far intemperate as to impair his health or induce delirium tremens." "Whether the health of William A. Davey was impaired by the use of alcoholic stimulants not taken in good faith for medicinal purposes or under

medical advice, is a matter to be determined by the jury under all the evidence." " If, on the other hand, the testimony does not so satisfy you, [that Mr. Davey became so intemperate in the use of alcoholic spirits as to impair his health, or that, at Alexandria Bay, in 1881, he indulged in the use of alcoholic liquor to such an extent as to induce delirium tremens,] or if you are convinced that all the liquor which he used was used in good faith, under medical advice and for medical purposes, as claimed by the plaintiff, then your verdict should be for the plaintiff." · " It is in evidence that Mr. Davey did take alcoholic stimulants under medical advice. If his taking them was only under such advice and only in such quantities as prescribed by [his] physician, even if impairment of health followed, yet the policy would not become void." " If, from all the testimony in this case, you conclude that Mr. Davey's condition in this respect was produced by a strict, fair and *bona fide* following of Dr. Kellerman's prescription, then that impairment of health, if there was any, which it is alleged existed, known as cirrhosis of the liver, does not avoid this policy."

There certainly can be no objection taken to these instructions when considered in the abstract, nor do we think there is anything in the context of the charge that in any degree militates against this view. On the contrary, in immediate connection with the last paragraph of the charge above objected to, the court called particular attention to the prescription of Dr. Kellerman, as testified to by Mrs. Davey, and further stated : " That prescription was, as Mrs. Davey gives it to us, to take an egg with sherry wine in the morning and a milk punch before retiring at night, and brandy and water, if he needed it, during the day. I-leave it entirely with you to say whether, if you believe the witnesses of the defendant and some of the witnesses for the plaintiff as to the habit of Mr. Davey in the use of intoxicating liquor for many years prior to his death, you can conscientiously say that such was a *bona fide* following of medical advice; otherwise the condition is broken if the impairment of health follows." These charges were not detrimental to the defendant, as to the law of the case, and fairly put the case to the jury upon this point.

The refusals to charge, as above specified, were justified, because the effect of the charges as requested would have been to utterly nullify those portions of the charge above set forth, which we have just stated properly put before the jury the law of the case. In that connection the court went to the uttermost limit it could go in the premises, by saying that " there was nothing in the case, so far as I remember, to justify the jury in finding that the quantity of liquor which Davey, according to the evidence of some witnesses, drank at Alexandria Bay in the summer of 1881, was taken in good faith, for medicinal purposes." On this branch of the case, therefore, we conclude there was no error on the part of the court below in the conduct of the trial. We think the law, as enunciated by us when the case was here before, was so stated to the jury that the defendant could not have been prejudiced, in any particular.

Sixteen of the specifications of error are but variant forms of the motion made at the close of the testimony to have the court direct the jury to bring in a verdict for the defendant. It is not necessary to consider them in detail. There was evidence in the case going to discredit, in some particulars, the evidence offered by the defence to prove the breach of the condition in the policy, and it was eminently proper that all of that evidence should be taken into consideration and weighed by the jury, under proper instructions from the court, in arriving at their verdict.

It is claimed, however, that on the merits of the defence the action of the court below was erroneous both as to what it charged and as to its refusals to charge; and those objections form the basis of seven other specifications of error. The charge of the court on the merits of the defence was to the effect that the burden of proof was on the defendant to establish its defence satisfactorily in the minds of the jury. In respect to this, after referring impartially, and somewhat in detail, to the evidence, the court said : " If, on the other hand, the testimony does not so satisfy you, or if you are convinced that all the liquor which he used was used in good faith, under medical advice and for medical purposes, as claimed by

the plaintiff, then your verdict should be for the plaintiff. In weighing this testimony I desire you to be guided by two principles which control in this case, and the first is this: That the burden of proof is upon the defendant in this case — that is, the obligation is upon it to prove the facts relied upon by it as a defence. The plaintiff is not called upon to prove that these facts did not exist. It is its duty to present to you evidence which is to satisfy your mind. Such evidence need not be so convincing as to make the effect beyond reasonable doubt, but the weight of the testimony must decidedly preponderate on the side of the defendant. The other principle is this: You are to be governed, as I have said, by the weight of evidence. Now, the evidence in the case is of two kinds, positive and negative, and you must distinguish between them. If a number of credible witnesses have testified that they have frequently seen a party intoxicated or visibly under the influence of strong drink, their testimony is not to be rejected because an equal number of like credible witnesses testify that they never saw the party in such a condition. The testimony in the one case is positive, in the other case it is negative, and both statements may be true. The witnesses for the plaintiff say that they never saw Mr. Davey intoxicated or so under the influence of liquor as not to be able to attend to his business. This testimony of itself does not negative or overcome the positive testimony of those who declared, under oath, that they had seen him intoxicated. You must weigh the testimony as a whole, and let the result of your deliberations be such as commends itself to sound reason and conscientious judgment."

In our opinion this charge of the court, with the exception of the statement that " the weight of the testimony must decidedly preponderate on the side of the defendant," (which will be noticed hereafter,) was, to say the least, quite as favorable to the defendant as it had the right to demand. The special charges prayed, so far as they were in accordance with law, were embraced in the charge as given.

A few of those specifications of error, however, require special mention. One of them grows out of a request to

charge made by the plaintiff, to wit, that "if those opinions (of physicians) are founded on testimony giving what is called the history of the case, the jury must determine whether that history is true. Therefore, if the jury do not credit the story of William White and Andrew Duclone, whose relation is stated to have been given to Dr. Watson, the jury have the right to reject his diagnosis; and they have the right, anyhow, if they do not confide, under all the evidence, in his skill and experience in cases of this sort." The court gave that charge as follows: "The first part of that charge is, that these opinions are founded upon testimony giving what is called the history of the case, and you must determine whether that history is true. You must determine whether the facts upon which the hypothetical questions are based have been proved or not to your satisfaction. I also charge you that you have the right, if you do not confide in Dr. Watson's skill and experience, under the evidence in this case, to reject his diagnosis." The exception is to these words: "I also charge you that you have the right, if you do not confide in Dr. Watson's skill and experience, under the evidence in this case, to reject his diagnosis."

It is not conceived that there is any error in that part of the charge. The jury were the judges of the credibility of the witnesses White and Duclone, and in weighing their testimony had the right to determine how much dependence was to be placed upon it. There are many things sometimes in the conduct of a witness upon the stand, and sometimes in the mode in which his answers are drawn from him through the questioning of counsel, by which a jury are to be guided in determining the weight and credibility of his testimony. That part of every case, such as the one at bar, belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men; and so long as we have jury trials they should not be disturbed in their possession of it, except in a case of manifest and extreme abuse of their function. Neither do we consider that there was any error in that part of the charge specifically excepted to therein. The jury were not told that

they could reject the evidence of Dr. Watson, but simply his diagnosis of the case, that is, his conclusion as to the nature of the disease from the various symptoms detailed by him. It may be true that Dr. Watson was fully as competent to diagnose the disease, if not more so, than the jury. But the province of the jury was to determine if the deceased died from the effects of acute alcoholism or delirium tremens, as claimed by the defendant, and in arriving at their conclusion they were required to weigh the evidence bearing upon that issue. The evidence of Dr. Watson was relevant and tended to prove the defence, but the weight to be given it lay with the jury. It was not the province of the court to direct the jury to accept the diagnosis of the case made by Dr. Watson. To have done so would have been to reject all the evidence offered by the plaintiff tending to establish a contrary conclusion, and would have had the effect to direct the jury to return a verdict for the defendant. We think the court committed no error in this particular.

Two of the specifications of error relate to the charge of the court, and its refusal to charge as requested, on the question as to whether Mr. Davey's death was occasioned by exposure to the sun, or sunstroke. The court was requested to charge, in this connection, that "there is nothing in the case to justify the jury in finding that Davy, in the summer of 1881, had a sunstroke." The court refused to give that charge in so many words, but said: "You will remember that counsel in summing up for the plaintiff alluded to certain symptoms, which were proved, which he claimed were evidences of sunstroke. There certainly has been no one who testified here that Mr. Davey had a sunstroke, in those words, but you are the judges of the evidence, as I have stated before, to say whether he was suffering from exposure to the sun or sunstroke, or whether he was suffering, as the other witnesses testify, from alcoholism or the other diseases named. Otherwise I decline to charge as asked. This leaves the matter entirely with you." We think the charge as given was as favorable to the defendant as it had the right to demand. It left the question to the jury, and that was eminently proper.

The most important specification of error in the entire list is as follows: " The court erred in charging the jury that ' the weight of the testimony must decidedly preponderate on the side of the defendant.' " Objection is particularly made to the use of the word " decidedly " in this connection. The argument is, that the effect of that part of the charge was to direct the jury to return a verdict for the plaintiff, unless the evidence introduced by the defendant to establish its defence should satisfy them, beyond a reasonable doubt, that the defence had been made out. The phrase " decidedly preponder ate " is not technically exact, with respect to the weight and quantity of evidence necessary and proper to justify a verdict in civil cases. If, therefore, this clause of the charge stood isolated from any other part of it, bearing upon the same subject matter, there would be serious objection to it. But we think the immediate context, as above quoted, shows that no such meaning can be fairly derived from it as is claimed by the defendant. On the contrary, such meaning is excluded in the same sentence, where the jury were told that " such evidence need not be so convincing as to make the effect beyond reasonable doubt; " and then immediately follows the clause objected to. We think the clause, when taken in connection with the whole tenor and effect of the entire charge, and especially in view of the immediate context, could not have misled the jury in the premises.

Eight other specifications of error relate to the effect to be given to the certificate of death furnished by Dr. Rae, the defendant contending that such certificate was of itself *prima facie* evidence of the fact that the deceased came to his death from the effects of alcoholic stimulants, etc.; and that that certificate must be overcome by the plaintiff to justify a recovery by her. On this point the court charged the jury as follows: " Now, gentlemen, as a matter of law, I charge you that this certificate is not to be taken or accepted by you as conclusive evidence of the truth of the facts therein stated, nor is the plaintiff bound by this statement or estopped from proving to your satisfaction a different cause of death. It is entitled to the weight which you would give an opinion of a

learned physician, as to the cause of his death, who saw the person spoken of shortly before his death, and who had personal knowledge of the person for some time previous to his death. Especially must that weight be given to this statement when, as in this case, the person who made the certificate, Dr. Rae, testifies before you that he adheres now to the opinion he expressed in that paper." And in the refusals to charge specifically on the question, as prayed by the defendant, the court did not depart from this general charge in any material respect. We think the charge as given embodies the law of the case on the point at issue, and, therefore, that the objections to it are without avail.

Upon the whole case we do not think that the defendant was in any manner prejudiced by any of the rulings of the court on the trial of the case. It may be that if we were to usurp the functions of the jury and determine the weight to be given to the evidence, we might arrive at a different conclusion. But that is not our province on a writ of error. In such a case we are confined to the consideration of exceptions, taken at the trial, to the admission or rejection of evidence and to the charge of the court and its refusals to charge. We have no concern with questions of fact, or the weight to be given to the evidence which was properly admitted. *Minor* v. *Tillotson*, 2 How. 392, 393; *Zeller's Lessee* v. *Eckert*, 4 How. 289; *Dirst* v. *Morris*, 14 Wall. 484, 490; *Prentice* v. *Zane*, 8 How. 470, 485; *Wilson* v. *Everett*, 139 U. S. 616.

*Judgment affirmed.*