Knights of Pythias *v.* Allen.

*(Jackson.* May 29, 1900.)

1. SUPREME COURT. *Will not reverse for technical error.*

The error is technical, and not sufficient ground for reversal, where, in an action on a life policy, the plaintiff was permitted to put a duplicate, instead of the original policy, in evidence, there being no controversy that the duplicate was in all respects correct. (*Post, p. 625.*)

2. INTEREST. *On life policy.*

In an action where there is a full recovery for the face value of a life policy, interest thereon follows, as matter of law, from the time the amount fell due, and the jury have no discretion to disallow interest. Hence, where the jury has returned a verdict for the face value of policy, without adding interest, the Court may himself compute and add the interest, or peremptorily instruct the jury to do so. (*Post, pp. 626–633.*)

Code construed: §§ 3494, 4894 (S.); §§ 2702, 3879 (M. & V.); §§ 1945, 3162 (T. & S.).

Cases cited: Brady *v.* Clark, 12 Lea, 326; Ins. Co. *v.* Van, 1 Shan. Cases, 443; Ins. Co. *v.* Meux, 1 Shan. Cases, 440; Ins. Co. *v.* Hamilton, 5 Sneed, 269; Williams *v.* Inman, 5 Cold., 267; Davidson County *v.* Olwill, 4 Lea, 34; Stumps *v.* Cooper, 3 Bax., 224.

3. JURY. *Reprimand of, by Court improper.*

While it is irregular and improper for the Court to induce action of a jury by reprimand, yet it does not constitute reversible error, when the action induced was clearly legal, and such as the Court himself could have performed without the aid of the jury. (*Post, p. 631.*)

Case cited: Brady *v.* Clark, 12 Lea, 326.

4. SAME. *Not finally discharged.*

A jury has not been finally discharged, so as to prevent their reassembling to complete and render their verdict, where, by previous consent of parties, they delivered their verdict to the

Knights of Pythias *v.* Allen.

Clerk in the absence of the Judge, but were, at that time, directed by the Clerk, at the request of one of the parties, to return at a specified hour and deliver their verdict to the Court. (*Post, pp. 626–628.*)

5. EVIDENCE. *Erroneous ruling as to admission immaterial, when.*

An erroneous ruling as to admission of evidence becomes immaterial and constitutes no cause for reversal, when no material evidence is offered or admitted under the ruling. (*Post, pp. 633, 634.*)

6. SAME. *Opinions not admissible.*

The opinions of witnesses who are not physicians or experts, that the assured was a physical wreck from the use of morphine and whisky, and that he was a slave to the habit, are not competent to show forfeiture of a life policy by reason of the use of said drugs by the assured to the impairment of health and the shortening of his life. (*Post, pp. 634, 635.*)

7. SAME. *Same.*

Where a physician, without any statement of facts, testifies that he did not know whether his patient took more whisky and morphine than was prescribed, but "thought he did," his answer is incompetent. (*Post, p. 635.*)

8. LIFE INSURANCE. *Forfeiture of policy by use of drugs.*

Forfeiture of a life policy on account of the use of forbidden drugs, causing impairment of health and hastening death, does not occur where such drugs were used by the assured as an invalid, under the advice of a physician, and in good faith as a medicine, and in such quantities and manner as they were prescribed. (*Post, pp. 635–637.*)

---

FROM SHELBY.

---

Appeal in error from the Circuit Court of Shelby County. L. H. ESTES, J.

Knights of Pythias *v.* Allen.

F. P. Poston for Knights of Pythias.

Turley & Wright for Allen.

Wilkes, J.   This is an action upon a policy of life insurance in a beneficial order upon the life of A. M. Musson for $3,000. There was a verdict and judgment in the Court below for the amount of the principal, $3,000, and interest, $441, in all $3,441, and the Knights order has appealed and assigned errors.

The first error assigned is, in substance, that a copy of the policy sued on is put in evidence, and not the policy itself. It appears that the original policy was, at one time, believed to be lost and a duplicate was issued, and the objection is to this duplicate. It is not insisted it is not a correct copy or duplicate. Suit was brought upon the original policy in the first inception of this controversy, and judgment was rendered against the company, and the cause was appealed to this Court, where the judgment of the Court below was reversed and cause remanded for another trial. Upon the remand, instead of withdrawing the original from the files in this Court and using it in the Court below, the duplicate was used. The objection under these circumstances we consider technical, and there is no reversible error in the action of the Court upon the use of the duplicate.

20 p—40

The next assignment is that the trial Judge, after the jury had rendered a verdict for $3,000, the principal of the policy, without interest, and as defendant claims had been discharged, were called before the trial Judge and required to compute and find interest also, according to his original instructions. It is said this was an interference by the Court with the jury which constitutes reversible error. It is not admitted that the policy bears interest as a matter of law, and that the giving of interest was imperative upon the jury, and it is further insisted that even if this be true, the jury having found a verdict "without interest" and been discharged, could not be required by the trial Judge to · compute and find interest also, but the remedy, if there was error, was to set aside the verdict and grant a new trial. Exactly what took place when and after the verdict was rendered is clouded in so many words that it is difficult to tell what did occur. The version given by defendant is that after the charge was delivered the trial Judge desired to leave the court room, and asked counsel if it would be satisfactory to allow the clerk to receive the verdict, and this was agreed to and the Judge left the court room. No verdict was returned that evening, but at 10:30 next morning, the Judge being still absent, the jury delivered to the clerk their verdict for $3,000 "without interest," and it was received by the clerk.

Counsel for plaintiff privately asked the clerk to order the jury to report back at 2 o'clock, which he did, and the clerk notified the Judge to be present at that time, and he was present, and after the verdict was handed him by the clerk he read it aloud to the jury, and asked them if it was their verdict, and the foreman replied, "Yes, sir." He then asked the foreman if he had read the charge, and counsel for defendant objected, because such interrogation was improper, and second, because under the agreement the verdict had been received and become a finality, and the jury had been discharged, and the Court could not recall the jury but could only grant a new trial if there was error. The Judge after some colloquy said: "I will let the jury come in and calculate interest on their verdict;" and when it came in he said: "You have not framed your verdict exactly as the Court said to frame it; I notice you have not calculated interest. Having found that verdict, you will have to calculate interest, as the Court charged, at the rate of six per cent. from the time when proofs of death were filed with the Supreme Lodge."

Plaintiff's version is substantially the same, except that it enters more into detail.

It appears that counsel for both parties objected to the Court asking anything of the jury, and the jury were ordered to retire during further consideration of the matters, and counsel for plain-

tiff asked the Court to withdraw from the jury all he had said on the feature of interest. He also asked the Court to send the jury to their room with instructions to compute interest upon their judgment, and the Court replied that he would bring in the jury and let them calculate interest. Counsel for defendant then insisted that if the jury should be sent back to their room to consider of their verdict, they might consider the whole matter anew, and give a different verdict if they should see proper to do so. The Judge agreed to this, but added: "If you find a verdict for plaintiff, you will have to allow interest at six per cent. as the Court charged originally." The jury retired and brought in a verdict for $3,000 and interest, and the Court rendered judgment on it. It appears that counsel for plaintiff asked the clerk, in the absence of the jury, not to receive their verdict, and when they brought in their verdict they were excused until Monday, and afterwards, on private request of counsel for plaintiff, they were asked to return at 2 o'clock on the same day and did so. We do not think that the facts show that the jury was discharged, although they may have separated. It was improper for the Judge to reprimand the jury as he did, but he might have added the interest himself or sent them to their room with instructions to do so. The latter is what he was at length persuaded by counsel on both sides to do,

and while the action of the trial Judge in talking to the jury as he did was improper, the right result was by the aid of counsel reached, and there is no reversible error. It is said, however, that it was discretionary with the jury to allow interest or not as they might choose, that the policy is one that does not bear interest as a matter of law under the provisions of the statute (Shannon, § 3494), because it is not a bill single, bond, note, bill of exchange or liquidated or settled account, but that the matter of interest is wholly one of discretion with the jury.

It is said the policy in this case is not an unconditional promise to pay—that proof of death must be furnished in the first place. In the next place, the policy has this clause: "Provided, however, that if at the time of the death of said brother, one monthly payment to the endowment fund by members holding an equal amount of endowment shall not be sufficient to pay the amount of endowment held by said brother, the benefit to be paid in case of death shall be a sum equal to one payment to the Endowment fund by each member holding an equal amount of endowment." So that the policy does not promise to pay a definite sum upon a specified contingency.

It is also shown that in a certain contingency, to wit, a violation of the by-law against the use

of narcotics, only a *pro rata* amount was to be paid.

It is insisted, on the other hand, that the policy bears interest as a matter of law. No case is cited where this Court has so expressly held in regard to life policies of insurance, but it is insisted that the policy comes within the spirit of the statute cited, and the case of *Brady* v. *Clark*, 12 Lea, 326, is relied on, in which the language is used that it is sufficient if the time when the money is to become due is ascertainable upon proof in relation to the condition.

It is said the clause in regard to the amount payable being regulated by the results of an assessment made for the payment of it is mentioned for the first time in this Court.

The most direct authority we have been able to find upon this question of interest upon beneficial certificates is a short reference in section 453 of Bacon on Benefit Societies, in these words: "It has been said that a claim against a benefit association bears interest from the time of the demand," citing 129 Ills., 298. And interest has often been allowed. 137 Ills., 118; 53 N. W. Rep., 367; 33 Pac. Rep., 1130. But this is not the invariable rule. 53 N. W. Rep., 238. We think, unquestionably, that if the association had defended on the ground that it did not have funds to meet the loss arising out of an assessment, and had shown that fact by proof, it

would have been, *pro tanto,* a defense against the policy itself and made it an obligation for an uncertain amount, in which case interest would not attach as a matter of law, but if the company makes no defense of this kind and supports it by no proof, it is not available as a defense to either principal or interest when made in this Court for the first time. We are of opinion that a life policy of insurance does fall within the reason and fair meaning of our statute, and does bear interest as a matter of law from the date when payable.

We are of opinion, as before stated, that while the action of the trial Judge was irregular, that there is no reversible error in it, and the jury could add interest upon the instruction of the Court, as they did. *Brady* v. *Clark,* 12 Lea, 326.

In *Imperial Fire Insurance Co.* v. *Van,* 1 Shannon's Tennessee Cases, 443, it was held that a policy of fire insurance not under seal is not a contract to pay a definite, fixed sum of money, but the actual value of the property destroyed, and hence, upon appeal, only bond for costs and damages could be required under the statute. But it was also held, in *Southern Life Insurance Co.* v. *Meux,* 1 Shannon's Cases, 440, that in case of a life policy under seal the appeal bond must be given to cover the judgment, damages and costs, under the provisions of § 4894, Shannon's com-

pilation. That section is, in substance, that in actions on bonds for the payment of money, bills single, bills of exchange, promissory notes, liquidated accounts signed by the party to be charged, whether obligations for the payment of bank notes or promissory notes, the appeal bond shall cover the whole debt, damages and costs. The Court held that a policy of life insurance was a bond or obligation to pay a certain sum of money, and that the contingency ended with the death of the assured and the payment of the money became an absolute and unconditional obligation to pay the insurance money on proof of conditions complied with and fell within the provisions of the statute for actions on bonds for the payment of money. This case cites and approves the case of *Mutual Protective Insurance Co.* v. *Hamilton*, 5 Sneed, 269, as holding the same doctrine.

We think the principle underlying these cases is the same as that involved in the present controversy. The instruments described in § 3494 as bearing interest as a matter of law are virtually the same as those in § 4894 prescribing that the bond for appeal shall be for the debt as well as damages and costs, and the principle which regulates the bond in the latter case is the same as that which authorizes interest in the former, and a life insurance policy comes under the provisions of each statute alike.

Whenever the statute applies, the rule that interest follows as a matter of law is imperative, and it is not a matter within the discretion of the jury. *Williams* v. *Inman,* 5 Cold., 267; *Davidson County* v. *Olwill,* 4 Lea, 34; *Stumps* v. *Cooper,* 3 .Baxter, 224; *Brady* v. *Clark,* 12 Lea, 324.

The fourth assignment is that the Court erred in permitting the plaintiff to introduce testimony to show that the local section or lodge of the order at Memphis had notice and knew of the dissipated habits of Musson, and · took no action to cancel the certificate. This evidence of two witnesses, Kirk Allen and A. C. Rogers, was introduced to show a waiver by the association of its by-law of 1896, which was, in substance, so far as necessary to be stated, that if the assured's death was caused or superinduced by the use of intoxicating liquors, narcotics or opiates, then only a *pro rata* payment should be made on the policy. It was alleged that the assured's death was caused by these means and the company was only liable for the *pro rata.*

It appears that the board of control was located in Chicago, but it is not shown that this board ever, as a matter of fact, knew of this dissipation, but the contention is that knowledge by the local officers and failure to act would constitute a waiver. The constitution of the order gives the board of control authority to cancel any certificate whenever a member becomes ad-

dicted to vices in any form so that in the opinion of the board his life or natural expectancy would be shortened and the risk rendered extraordinarily hazardous. The argument is that the board must be held to have notice through its subordinate officers and agents and be affected by it, and having such knowledge, if they failed to cancel they must have waived the requirement. But we think we need not pass upon this assignment, since the evidence of the witness, Allen, does not show that he knew that Musson ever used opiates or narcotics, but only whisky, but to what extent he did not know, and it was not shown that the use of whisky hastened the death, but if caused by any dissipation it was from the use of narcotics, and the same may be said of the testimony of Rogers. It seems the Court did not charge upon this feature, and there was no request that he should. So that we think there was a failure on the part of plaintiff to offer any proper proof of a waiver or to properly present that feature of the case to the Court, and it becomes entirely immaterial.

The fifth assignment is as to the introduction of evidence of John A. Musson so far as he stated that the assured was a wreck "from the use of morphine and liquor." The Court excluded that part which stated that his physical wreck "was caused by morphine and whisky," and "that he seemed to be unable to resist the habit longer," and

also the testimony of Mrs. Ida Musson that after a certain time "he seemed to be a slave to morphine," and that his physical condition was the result of his taking morphine, and also to the testimony of Dr. Hare when he stated that he prescribed morphine and whisky for him, and in answer to a question whether he took more than was prescribed, said he did not know, but "thought he did." The Court excluded that part which says "he thought he did."

The evidence of John A. and Ida Musson which was excluded, was simply the opinions of these witnesses, who were not physicians or experts. These drugs had been prescribed by physicians for the assured to take, to counteract an asthmatic trouble, and these witnesses were not competent to say that the use was excessive.

The part of Dr. Hare's testimony that was excluded was clearly incompetent, as he stated "he did not know, but thought he did." He was not asked as to assured's appearance or the manifestations of drugs, and he stated he had no knowledge, and the mere expression, "I thought he did" is thus shown to be a mere conjecture on the part of the witness, and not an opinion based on facts or appearances.

It is assigned as error that the Court erred in charging the jury as follows:

(1) "If you should find from the evidence that the death of Albert Musson was caused or super-

induced by the use of narcotics, opiates, or intoxicating liquors, and you should further find that at the beginning of his illness his attending physician had prescribed such narcotics, opiates or liquors in moderate doses, and that he continued to use the same in moderate doses, under the advice and prescription, but not beyond the directions of his physician, such moderate and prescribed use would not be a violation of the rules, regulations and by-laws of the defendant."

And also in charging the jury as follows:

(2) "The plaintiff is entitled to recover even if the defendant has shown by a preponderance of the evidence that the death of Albert Musson was caused or superinduced by the use of intoxicating liquors, narcotics or opiates, if you likewise believe from the evidence that the said Albert Musson took the intoxicants, opiates or narcotics under the advice of his physician, and in the manner and amounts prescribed by his physician."

It is argued that the advice of a physician in the case would be no protection, and that the contract is plain that if the death was caused by the use of the narcotics there could be no recovery. The view of the learned trial Judge is supported by authority. Bacon Benefit Societies. Vol. 22, Section 328, and authorities cited. *Aetna Life Insurance Co.* v. *Ward,* 140 U. S., 76-91. In the latter case it was held that strong

drink taken in good faith under medical advice and for medical purposes was not a violation of the condition in a policy similar to the one now under consideration. It was said: "It is in evidence that the assured did take alcoholic stimulants under medical advice, and if his taking them was only under such advice and only in such quantities as· was prescribed by a physician, even if impairment of health followed, it would not avoid the policy, and if his impairment of health was caused by a strict, fair and *bona fide* following of the doctor's prescription, then the policy would not be avoided. It appears that these narcotics, as well as other drugs, are used by physicians to counteract disease such as the assured had, and though all are to some extent poisonous, yet the effect is to prolong life and relieve the afflicted party for the time being, so that the use of such drug under the advice of a physician and according to directions, without excess, could not be considered a violation of the terms of the policy but a duty of the assured."

There is no reversible error in the record, and the judgment of the Court below is affirmed with costs.