[Cite as *State v. Cobb*, 2015-Ohio-3661.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P. J. |
| Plaintiff-Appellee | Hon. John W. Wise, J.<br>Hon. Patricia A. Delaney, J. |
| -vs- | |
| | Case No. 2014 CA 00218 |
| MARCUS RAYMOND COBB | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:     Criminal Appeal from the Court of Common
                             Pleas, Case No.  2014 CR 00104


JUDGMENT:                    Affirmed


DATE OF JUDGMENT ENTRY:      September 8, 2015


APPEARANCES:

For Plaintiff-Appellee              For Defendant-Appellant

JOHN D. FERRERO                     JONATHAN MORRIS
PROSECUTING ATTORNEY                REDINGER & MORRIS
RONALD MARK CALDWELL                116 Cleveland Avenue, NW
ASSISTANT PROSECUTOR                Suite 418
110 Central Plaza South, Suite 510  Canton, Ohio  44702
Canton, Ohio  44702-1413

*Wise, J.*

**{¶1}** Appellant Marcus Raymond Cobb appeals his conviction and sentence entered in the Stark County Court of Common Pleas on one count of complicity to murder, one count of complicity to aggravated burglary and one count of aggravated robbery, each with connected firearm specifications.

**{¶2}** Appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

**{¶3}** On December 13, 2013, four Cleveland juveniles David Sharp, Keontye Sharp, Amir Eppinger, and Maurice Fountain, decided to come to Canton to commit some robberies. Two members of the group, David Sharp and Amir Eppinger, cut off their ankle bracelets which had been placed on them for probation monitoring purposes in order to come to Canton. The reason the group decided to come to Canton was twofold: they were too well known in the Cleveland area for their robbery activities, and David Sharp and Amir Eppinger had previously been to Canton. As a result, the four showed up at the Canton residence of Pearl West.

**{¶4}** Appellant Marcus Raymond Cobb was present at the West residence when the four were there. A so-called tattoo party ensued, and Cobb, who was a tattoo artist, gave Keontye Sharp a tattoo. For payment, Sharp gave Cobb a .9 mm Taurus semiautomatic handgun. During this party, the talk turned to the group making some money and the possibility of robbing someone, especially an easy or "soft" target. Cobb told the group about Michael Sibert, a drug dealer he knew and whom he considered to be a soft, easy target. Cobb knew Sibert because he had smoked marijuana with him

and used to live next door to him. The five then decided to steal a car and go rob Sibert, armed with the .9 mm Taurus handgun.

{¶5}  The five proceeded to Sibert's apartment at Skyline Terrace in a stolen purple Dodge Intrepid. Cory Hall, a residence of this apartment complex, saw the vehicle pull into the parking lot. Hall particularly noticed the appearance of the driver, Marcus Cobb, who had long hair like a female. Once the vehicle stopped, Hall saw the three men sitting in the back seat of the vehicle leave and go into the apartment building where Sibert lived. Shortly afterwards, Hall heard gunshots from this building, and then saw two of the men run back to the vehicle which then drove away.

{¶6}  According to David Sharp and Eppinger, the three of them, including Maurice Fountain, knocked on Sibert's door. Cobb had told them which apartment Sibert lived in. While they were talking with Sibert about buying drugs, Fountain saw a gun lying on a table. Fountain grabbed the gun, and Sibert charged at him. A struggle and shots ensued.

{¶7}  Stanley Pearson, who was also inside the residence, joined in the fray once the struggle began. He fought with David Sharp and Eppinger, who were eventually able to flee the residence after the shots were fired. Eppinger had been shot during the struggle between Fountain and Sibert. As Fountain lay dying, having been shot twice in the face, he grabbed the .9 mm Taurus that he had brought with him and shot Sibert once in the chest, immediately killing Sibert with a shot to the heart.

{¶8}  Fountain died two days later after being taken to a hospital.

{¶9}  The remaining four robbers decided to split up. Keontye Sharp stole another vehicle and went back to Cleveland. The other three spent the night in a stolen

van, and then drove back to Cleveland after switching license plates. Once in Cleveland, the three decided to drive to Florida. The three were arrested in a hotel in Winston-Salem, North Carolina by local authorities, and were eventually returned to Ohio.

{¶10} While in custody, David Sharp gave a statement to the police. Eppinger, however, asked for a lawyer and was not questioned.

{¶11} Cobb also gave a statement to police. Cobb admitted to being at the "tattoo party" with the four Cleveland youths, and to giving one of them a tattoo. He denied, however, any knowledge about an armed robbery attempt. Instead, he maintained that the four drove with him to the Skyline Terrace area in order to buy some marijuana. Shots were soon fired, and two of the three who had gone inside to buy the weed came running out and into the waiting vehicle. The group then drove off, and the two who returned talked about what had happened inside the apartment. Upon hearing about the shootings, Cobb told the police he got out of the vehicle and took a bus back to West's residence. Cobb denied any knowledge that the group was planning an armed robbery. He asserted that he believed that the Cleveland guys were merely going to Sibert's residence to buy marijuana. (T.(I) 209, 211-215); (Transcript of Cobb's statement to police).

{¶12} David Sharp and Eppinger reached a deal with the prosecution, which resulted in them pleading guilty to three charges: complicity to involuntary manslaughter, aggravated burglary, and aggravated robbery, with firearm specifications and receiving prison terms of 14 years, in exchange for cooperating with the State of Ohio. As a result, Eppinger gave a statement to the police, which led to the location of

Keontye Sharp, who was then arrested. Keontye Sharp also gave a statement to the police and agreed to cooperate with the State of Ohio. As a result, all three testified against Cobb at his trial.

{¶13} On March 25, 2014, as a result of the above events, Appellant Marcus Raymond Cobb was indicted on one count of Complicity to Murder, in violation of R.C. §2923.03, one count of Complicity to Aggravated Robbery, in violation of R.C. §2911.01, a felony of the first degree, and one count of Complicity to Aggravated Burglary, in violation of R.C. §2911.11, a felony of the first degree. Each of these charges had an attendant Firearm Specification attached to it, in violation of R.C. §2941.145

{¶14} Appellant pled not guilty to the charges and the matter proceeded to jury trial.

{¶15} At trial, the jury heard testimony from Keontye Sharp, David Sharp and Amir Eppinger. Their testimony was as follows:

{¶16} Keontye Sharp, who was 16 at the time of the robbery-homicide, testified that he came to Canton that day with his brother David, Amir Eppinger, and Maurice Fountain in order to commit a robbery. They met Cobb at Pearl West's residence, where Cobb gave Sharp a tattoo. For payment, Sharp gave him a gun that he had stolen from a car in Cleveland. While at the party, they discussed robbing Sibert. Cobb told them that Sibert's drugs and stuff would be on a table. Sharp then drove another stolen vehicle to the Sibert residence. Because he did not know where he was going, having never been to Canton before, Sharp followed Cobb's directions to get there. Once there, the three in the back seat: David Sharp, Eppinger, and Fountain, got out of the car and

proceeded to the apartment building pointed out by Cobb. Shortly afterwards, shots were heard from this building, and David Sharp and Eppinger came running out and jumped back into the vehicle. David ran so hard that he lost his shoes. The four then drove back to the West residence, where they split up. Sharp admitted that he stole a vehicle and returned to Cleveland on his own. (T.(I) at 162-174,179-181, 184-185). Sharp saw his brother, Eppinger, and Cobb in Cleveland a day or so later. Those three talked about the need to leave the area, and discussed going to North Carolina. Sharp gave them his iPod for them to sell and raise some money for the trip. Sharp remained in contact with them until their arrest. Sharp himself was later arrested at his stepfather's residence. (T.(I) at 175-177).

**{¶17}** David Sharp's testimony corroborated the trial testimony of his brother about coming to Canton for the purposes of committing a robbery. He testified that he and Eppinger had been to Canton before, so they ended up at Pearl West's residence. While there, Cobb gave his brother a tattoo, for which Keontye gave Cobb a stolen handgun, the same handgun which would be used by Fountain to kill Sibert. After telling Cobb about the purpose of their trip to Canton, Cobb suggested that they rob a store. Cobb assured them that there was only one clerk there, and it would be easy to rob. The group drove to the store, with Cobb directing them to the location. The group noticed too many people there, however, so they opted not to go through with that robbery.

**{¶18}** Subsequently, Cobb told the group about a drug dealer he knew who would be an easy target. That drug dealer was Michael Sibert, known by his street name as "Munch." Cobb then directed the group to the apartment building where Sibert

lived. Once there, Sharp, Eppinger and Fountain went into the apartment building, while Cobb and Sharp's brother remained in the vehicle. They followed Cobb's directions to Sibert's apartment, knocked, and responded that they were "Otis." Sibert told them to come inside, and after talking about drugs, Sibert left the living room to get the drugs. Fountain then grabbed a revolver, which was on the table, and then shot at Sibert when he came charging at him. While these two fought, Sharp and Eppinger struggled with the other man in the apartment, Stanley Pearson, and managed to flee as more shots were fired. Sharp ran so hard that he lost his shoes. He and Eppinger returned to the vehicle and drove off with Cobb and Sharp's brother. (T. (II) at 30-44). Sharp, Eppinger, and Cobb stayed together that night and later went to Cleveland. From there, the three opted to go to Florida and were eventually arrested in North Carolina. (T. (II) at 44-49).

{¶19} Amir Eppinger testified about the four getting together in Cleveland in order to come to Canton in order to rob someone. Eppinger had been to Canton before, and thus the group headed to Pearl West's residence. Once there, Cobb showed up and gave Keontye Sharp a tattoo. As payment, Sharp gave Cobb a stolen loaded .9 mm semiautomatic handgun. This gun eventually ended up in Maurice Fountain's possession and was used by Fountain during the robbery to kill Sibert.

{¶20} Before then, however, Cobb suggested Sibert as a target when the group told him about their plans to rob someone. The group then piled into a stolen vehicle and followed Cobb's instructions to the Skyline Terrace apartment building. Cobb told them which apartment was Sibert's, so the three in the back seat: Eppinger, David Sharp, and Fountain, proceeded to Sibert's apartment and knocked on the door. Once they were inside, the phony drug deal quickly turned into a robbery attempt, which

ended with Fountain struggling with and shooting Sibert, while Eppinger and David Sharp fought with Pearson. Eppinger and David Sharp were able to flee the apartment building and flee with Cobb and Keontye Sharp, who were waiting in the vehicle. The four of them drove back to the West residence. Keontye Sharp left them to immediately return to Cleveland, while the other three took a couple days to return there. Once there, Cobb suggested that they go to Florida, and the three were arrested in North Carolina on their way there. (T. (II) at 63-84).

{¶21} Cobb did not testify or present any evidence in his case-in-chief at trial.

{¶22} After hearing all the evidence and deliberating, the jury found Appellant guilty as charged.

{¶23} The trial court sentenced Appellant to 15 years to life on the Complicity to Murder charge. The Complicity to Aggravated Robbery and Complicity to Aggravated Burglary counts were merged with the Complicity to Murder count. The trial court also imposed the mandatory 3-year prison term for the three firearm specifications. The firearm specifications for the Complicity (Murder) and Complicity (Aggravated Burglary) offenses were imposed consecutively, but the firearm specification for the Complicity (Aggravated Robbery) offense was imposed concurrently. The aggregate prison term was twenty-one (21) years to life imprisonment.

{¶24} Appellant now appeals, raising the following assignments of error for review:

ASSIGNMENTS OF ERROR

{¶25} "I. THE TRIAL COURT ERRED IN SENTENCING THE APPELLANT TO TWO CONSECUTIVE FIREARM SPECIFICATIONS.

**{¶26}** "II. THE APPELLANT'S CONVICTION FOR ONE COUNT OF COMPLICITY TO MURDER, ONE COUNT OF COMPLICITY TO AGGRAVATED BURGLARY AND ONE COUNT OF AGGRAVATED ROBBERY WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

**I.**

**{¶27}** In his First Assignment of Error, Appellant argues that the trial court erred in imposing multiple, consecutive sentences for the gun specifications in this case. We disagree.

**{¶28}** Appellant assigns as error the trial court's imposition of two, consecutive gun specifications.

**{¶29}** R.C. §2941.145(A), provides in pertinent part:

**{¶30}** "(A) Imposition of a three-year mandatory prison term upon an offender under division (B)(1)(a) of section 2929.14 of the Revised Code is precluded unless the indictment, count in the indictment, or information charging the offense specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

**{¶31}** Appellant argues that his crimes were committed as a single transaction, and therefore consecutive sentences are prohibited by R.C. §2929.14(B)(1)(b).

**{¶32}** According to R.C. §2929.14(B)(1)(b), a court may not impose multiple firearm specifications for felonies that were committed as part of the same act or transaction *unless* R.C. 2929.14(B)(1)(g) applies.

**{¶33}** R.C. §2929.14(B)(1)(g) serves as an exception to the rule that multiple firearm specifications must be merged for purposes of sentencing when the predicate offenses were committed as a single criminal transaction, and provides:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, *the sentencing court shall impose* on the offender the prison term specified under division (B)(1)(a) of this section *for each of the two most serious specifications of which the offender is convicted* or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications. (Emphasis added.)

**{¶34}** In the instant case, the record is clear that appellant was convicted of multiple felonies, to wit: one count of complicity to murder, one count of complicity to aggravated robbery and one count of aggravated burglary. The trial court was required by R.C. §2929.14(B)(1)(g) to sentence appellant to the two most serious firearm specifications that accompanied his felony convictions for complicity to murder and complicity to aggravated burglary or complicity aggravated robbery.

**{¶35}** "[R]egardless of whether [a defendant's] crimes were a single transaction, when a defendant is sentenced to more than one felony, including [murder] and [aggravated robbery and/or aggravated burglary], the sentencing court 'shall impose'

the two most serious gun specifications." *State v. Isreal,* 12th Dist. Warren No. CA2011–11–115, 2012–Ohio–4876, ¶71. *See also State v. Ayers,* 12th Dist. Warren No. CA2011–11–123, 2013–Ohio–2641, ¶ 20–25; *State v. Cassano,* 8th Dist. Cuyahoga No. 97228, 2012–Ohio–4047, ¶32–34.

**{¶36}** We therefore find that the trial court did not err in concluding that the firearm specifications accompanying the complicity to murder count and the complicity to aggravated burglary were not subject to merger pursuant to R.C. §2929.14(B).

**{¶37}** We therefore find the trial court did not err in ordering two of the three firearm specifications to run consecutively.

**{¶38}** Appellant's First Assignment of Error is overruled.

**II.**

**{¶39}** Appellant, in his Second Assignment of Error, argues that his convictions were against the manifest weight and sufficiency of the evidence. We disagree.

**{¶40}** In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins,* 78 Ohio St.3d 380, 387, 1997–Ohio–52, 678 N.E.2d 541, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983).

**{¶41}** An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to

the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus (1991).

**{¶42}** In the case *sub judice*, Appellant is challenging his convictions for complicity (R.C. §2923.03(A)(2)) to murder, in violation of R.C. §2903.02(B) complicity to aggravated burglary, in violation of R.C. §2911.11(A)(1) and (2), and complicity to aggravated robbery, in violation of R.C. §2911.01(A)(1) and (2), which provide:

Complicity

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense;

***

Murder

***

(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

Aggravated Robbery

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

(2) Have a dangerous ordnance on or about the offender's person or under the offender's control;

\*\*\*

Aggravated Burglary

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

\*\*\*

**{¶43}** Specifically, Appellant argues that the evidence presented by the State failed to show that he was anything other than an "unsuspecting traveler" traveling with others whom he "believed were going to buy weed from a known Canton drug dealer." (Appellant's brief at 11).

**{¶44}** Here, the testimony presented at trial showed that Appellant was instrumental in the aggravated robbery and aggravated burglary, which resulted in the murder. Appellant suggested Sibert as a robbery target, he told the group where Sibert lived, how to gain entrance to the apartment, warned them that Sibert would have a gun on the living-room table, went along with the group to the apartment and waited in the get-away car. Together with the rest of the testimony from Eppinger and the Sharp brothers, as set forth in more detail above, we find sufficient evidence was presented as to Appellant's knowledge of the robbery/burglary which led to the death of Sibert.

**{¶45}** A fundamental premise of our criminal trial system is that 'the *jury* is the lie detector.' *United States v. Barnard,* 490 F.2d 907, 912 (C.A.9 1973) (emphasis added), cert. denied, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). Determining the weight and credibility of witness testimony, therefore, has long been held to be the 'part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.' *Aetna Life Ins. Co. v. Ward,* 140 U.S. 76, 88, 11 S.Ct. 720, 724–725, 35 L.Ed. 371 (1891)". *United States v. Scheffer* (1997), 523 U.S. 303, 313, 118 S.Ct. 1261, 1266–1267.

**{¶46}** The jury was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence". *State v. Craig* (Mar. 23, 2000), Franklin App. No. 99AP–739, citing *State v. Nivens* (May 28, 1996), Franklin App. No. 95APA09–1236 Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *State v.*

*Raver,* Franklin App. No. 02AP–604, 2003–Ohio–958, at ¶21, citing *State v. Antill* (1964), 176 Ohio St. 61, 67, 197 N.E.2d 548.; *State v. Burke,* Franklin App. No. 02AP1238, 2003–Ohio–2889, citing *State v. Caldwell* (1992), 79 Ohio App.3d 667, 607 N.E.2d 1096.

{¶47} After reviewing the evidence, we cannot say that this is one of the exceptional cases where the evidence weighs heavily against the convictions. The jury did not create a manifest injustice by concluding that Appellant was guilty of the complicity to murder, aggravated robbery and aggravated burglary. Appellant's convictions are supported by sufficient evidence and not against the manifest weight of the evidence.

{¶48} Based upon the foregoing and the entire record in this matter, and viewing this evidence in a light most favorable to the State, a rational trier of fact could have found Appellant guilty of the crimes as charged. Further, the judgment is not against the manifest weight of the evidence

{¶49} Appellant's Second Assignment of Error is overruled.

{¶50} For the foregoing reasons, the judgment of the Court of Common Pleas, Stark County, Ohio, is affirmed.

By: Wise, J.

Hoffman, P. J., and

Delaney, J., concur.

JWW/d 8/19