EQUITABLE TRUST Co. *et al. v.* CENTRAL TRUST Co. *et al.**

(*Knoxville.* September Term, 1921.)·

1. **CORPORATIONS.** Foreign corporation without right to do business without filing charters, etc., as required by statute.

Foreign corporations have no right to do business in the state without first complying with the provisions of the statutes with reference to the filing of their charters, etc. (*Post, pp.* 171, 172.)

2. **CORPORATIONS.** Foreign corporations not complying with statutes ordinarily without standing before the courts.

A foreign corporation, failing to comply with the statutes with reference to the filing of its charters, etc., ordinarily has no standing before the courts for the enforcement of its rights. (*Post, pp.* 171, 172.)

Cases cited and approved: Cary-Lombard Lumber Co. v. Thomas, 92 Tenn., 587; Insurance Co. v. Kennedy, 96 Tenn., 711; New York, etc., B. & L. Ass'n v. Cannon, 99 Tenn., 344; Lumber Co. v. Moore, 126 Tenn., 313; Amusement Co. v. Albert, 128 Tenn., 417; State v. O'Brien, 94 Tenn., 79; Packett Co. v. Agnew, 132 Tenn., 265; State ex rel. v. Telephone & Telegraph Co., 114 Tenn., 194.

3. **CORPORATIONS.** Stockholders in foreign corporation, doing business without complying with statute liable as partners.

Stockholders in a foreign corporation attempting to do business as such in the State, without attempting to comply with the statutory requirements relating to foreign corporations, are liable on their contracts as partners, though made in the name of the coporation, and though they did not know of such noncompliance. (*Post, pp.* 172, 173.)

---

*On the question of partnership liability of stockholders of a foreign corporation in a state in which it is doing business, see note in L. R. A., 1917B, 574.

On liability of pledgee of stock as a stockholder, see note in 19 L. R. A. (N. S.), 249; 36 L. R. A., 139.

Equitable Trust Co. v. Central Trust Co.

Cases cited and approved: Cunnyngham v. Shelby, 136 Tenn., 176; Taylor v. Branham, 35 Fla., 297; Bigelow v. Gregory, 73 Ill., 197; Loverin v. McLaughlin, 161 Ill. 417; Hill v. Beach, 12 N. J. Eq., 31; Lasher v. Stimson, 145 Pa., 30; Guckert v. Hacke, 159 Pa., 303.

4. CORPORATIONS. Complainant, seeking to hold stockholders as partners, has burden of showing defendant was stockholder.

Complainants, seeking to hold stockholders of a foreign corporation liable as partners on the ground that the corporation had no authority to do business within the State, had the burden of proving that a defendant was a stockholder. (*Post, pp.* 173, 174.)

.5. CORPORATIONS. Evidence insufficient to show bank sought to be held liable as stockholder held stock otherwise than as collateral security.

In a suit to hold stockholders in a foreign corporation not authorized to do business in Tennessee liable as partners, evidence *held* insufficient to show that a defendant bank held any stock otherwise than a collateral security for loans to individual shareholders. (*Post, pp.* 173, 174.)

6. CORPORATIONS. Pledgee of stock not appearing on books as absolute owner not liable to creditors as stockholder.

One to whom or for whose benefit stock is transferred merely as security for a debt, and who does not appear on the stock books of the corporation as absolute owner of the stock, is not subject to liability to creditors as a stockholder. (*Post, p.* 174.)

Cases cited and approved: Andrews v. National F. & P. Works, 76 Fed., 166; Sturtevant v. Natl. F. & P. Works, 88 Fed., 613; Pauly v. State, L. & T. Co., 165 U. S., 606; Rankin v. Fid., etc., Co., 189 U. S., 242.

7. CORPORATIONS. Evidence held to show that defendant was stockholder in foreign corporation, and liable as such.

In an action against stockholders in a foreign corporation not authorized to do business in Tennessee, evidence *held* to show that a bank claiming to hold stock only as collateral security, was a stockholder, and actually participated in the affairs of the corporation. (*Post, pp.* 174-178.)

8. **EVIDENCE.** Testimony, based on information derived from books of bank not produced for examination, properly excluded.

Testimony that stock was transferred to a bank as security was properly excluded as not the best evidence, where the witnesses' knowledge was based on information secured from the books of the bank, which were not produced and tendered to the adverse parties for their examination, and they were afforded no opportunity to cross-examine the witnesses as to matters or entries appearing on the books. (*Post, p.* 178.)

9. **CORPORATIONS.** Stockholders in unauthorized corporation liable for advances made ouside the state on contracts for the sale of iron to be stacked within the State.

Contracts for the sale of pig iron, which the seller contracted to stack on its yards at Dayton, Tenn., subject to the orders of the buyers, who, at points outside the State, made advances to the seller, were Tennessee contracts; and, where the seller was a foreign corporation not authorized to do business in Tennessee, the stockholders were liable as partners for the advances. (*Post, pp.* 178-180.)

Cases cited and distinguished: Hall v. Cordell, 142 U. S., 116; Hubble v. Morristown Land Co., 95 Tenn., 585; Neal v. New Orleans, etc., Ass'n., 100 Tenn., 607.

10. **CORPORATONS.** Claims for freight charges held claims for which stockholders of unauthorized foreign corporation were liable as partners.

Where iron ore was shipped from points in Georgia to Dayton, Tenn., consigned to a foreign corporation not authorized to do business in Tennessee, and the freight charges were payable in Tennessee, the stockholders were liable therefor as partners. (*Post, pp.* 180, 181.)

11. **CORPORATIONS.** Persons dealing with unauthorized foreign corporation as such not estopped to deny corporate existence and hold stockholders liable.

Persons dealing with a foreign corporation not authorized to do business in the State as a corporation were not thereby estopped to deny its corporate existence and assert liability against the stockholders as partners or otherwise. (*Post, p.* 181.)

Equitable Trust Co. v. Central Trust Co.

Cases cited and approved: Harrill v. Davis, 168 Fed., 187; Empire Mills v. Alston Grocery Co., 15 S. W., 505.

12. **CORPORATIONS.** Stockholders in foreign corporation doing business without authority not liable for money borrowed and payable outside the State.

Where a foreign corporation, doing business in Tennessee without complying with the statutory requirements, borrowed money at points outside the State, which was used in the prosecution of its business in the State, but the loans or advances were payable where negotiated, the contracts were not Tennessee contracts, and the stockholders were not liable thereon as partners. (*Post, pp.* 181-183.)

13. **CORPORATIONS.** Error to stay execution against stockholders liable as partners until ascertainment of amount recoverable from corporation's bankrupt estate.

In a suit to hold stockholders in a foreign corporation doing business in the State without authority liable as partners, it was error to stay executions until the amounts to be received by the creditors in a bankruptcy proceeding against the corporation were ascertained and credited. (*Post, pp.* 183, 184.)

14. **PARTNERSHIP.** Partner paying firm debt not entitled to prorate with other creditors of firm.

A partner paying a debt of the firm is entitled to contribution from his copartners, but is not subrogated to the right of the creditor whose debt he has paid to prorate with other creditors of the firm in the firm's estate in bankruptcy. (*Post, pp.* 183, 184.)

Case cited and approved: Reyerson & Son v. Shaw, 277 Ill., 524.

15. **INTEREST.** Allowance within chancellor's discretion when claims not within statute.

Claims for freight charges and advances under contracts for the purchase of pig iron, not being represented by bills single, bonds, notes, bills of exchange, or liquidated and settled accounts signed by the debtor, and therefore not bearing interest as a matter of law under Shannon's Code, section 3494, the allowance of interest was within the sound discretion of the chancellor. (*Post, pp.* 184-187.).

Cases cited and approved: Knights of Pythias v. Allen, 104 Tenn., 633; Railroad v. Fort, 112 Tenn., 455; Gibson County v. Rains, 79 Tenn., 24; Davidson County v. Olwill, 72 Tenn., 34; Shoun v. Armstrong, 59 S. W., 790; Stearns, etc., Co. v. Jamestown R. Co., 141 Tenn., 203; Grizzard v. Fits, 137 Tenn., 103.

RESPONSE TO PETITION TO REHEAR.

16. **ELECTION OF REMEDIES.** Rule of judicial estoppel, by assuming position inconsistent with prosecution of alternative remedy, stated.

Where two or more inconsistent remedies depend on inconsistent facts, and a suitor necessarily assumes a position inconsistent with the position which he must afterwards assume to prosecute the alternative remedy, an election, deliberately made, with full knowledge of the facts, and without fraud or imposition, works a judicial estoppel against him. (*Post, p.* 187.)

17. **CORPORATIONS.** Creditors of unauthorized foreign corporation held not estopped by other proceedings from holding stockholders as partners.

Creditors of a foreign corporation doing business in Tennessee without authority, by bringing a suit to wind it up as an insolvent corporation and administer its assets as such, on allegations that it had not complied with the laws of the State respecting foreign corporations and by participating in the distribution of the assets of the company in the bankruptcy court without alleging any different facts, were not estopped to hold the stockholders liable as partners. (*Post, pp.* 188-190.)

Case cited and approved: Cunnyngham v. Shelby, 136 Tenn., 176.

FROM HAMILTON.

Appeal from the Chancery Court of Hamilton County. —Hon. W. B. GARVIN, Chancellor.

STRANG & FLETCHER, WILLIAMS & LANCASTER, J. M. LITTLETON, JOE V. WILLIAMS and ALLISON, LYNCH & PHILLIPS, for Equitable Trust Co. and others.

SIZER, CHAMBLISS & CHAMBLISS, for Central Trust Co. and others.

MR. JUSTICE HALL delivered the opinion of the Court.

The bill in this cause was originally filed in the chancery court of Rhea county, but by agreement of counsel it was transferred to the chancery court of Hamilton county, and was there tried and determined.

The bill was filed by a number of creditors of the Dayton Coal & Iron Company, Limited, against the Commercial Bank of Scotland and the Bank of Scotland, seeking to hold said banks liable as partners upon the theory that they were stockholders in said corporation, which was chartered and organized under the laws of Great Britain, and had been doing business for a number of years in the State of Tennessee without having complied with its laws respecting foreign corporations.

It appears that in 1883, a corporation was organized under the laws of Great Britain under the name of Dayton Coal & Iron Company, Limited, hereinafter called the Dayton Company; that it acquired a large number of acres of coal and iron lands in the State of Tennessee, from which it developed and operated coal mines and built and operated furnaces for the manufacture of pig iron, and also established and operated commissaries for the sale of merchandise to its employees and others; and that this corporation complied with the laws of Tennessee

relating to foreign corporations doing business in the State.

In 1895 the firm of James Watson & Co., iron merchants of Glasgow, Scotland, became the owners of practically the entire issue of stock of said Dayton Company, and soon thereafter organized another corporation of the same name for the purpose, as recited in its charter, of leasing and operating the Tennessee properties; and that in 1897 the same parties organized a third corporation of the same name, also for the purpose, as recited in its charter, of taking over and operating said properties in Tennessee.

On January 28, 1903, a mortgage purporting to have been executed by the Dayton Company to secure the payment of £100,000 of debentures was registered in Rhea county, Tenn.

On June 4, 1913, the Dayton Company having become insolvent, a general creditors' bill was filed in the chancery court of Rhea county to have it wound up as an insolvent corporation, and its assets administered as such.

On October 18, 1913, the defendant Central Trust Company filed a cross-bill in said cause to foreclose the mortgage above referred to.

A hearing was had in said cause, and the chancellor rendered a decree holding said mortgage invalid. This decree was affirmed by the court of civil appeals. The cause was then brought to this court. This court reversed both the decree of the court of civil appeals and the chancellor, and held said mortgage valid, decreeing that the defendant Commercial Bank of Scotland was the owner of £55,000 of the debentures, and the Bank of Scotland

Equitable Trust Co. v. Central Trust Co.

was the owner of £35,000 of the debentures secured by said mortgage, and the cause was remanded to the chancery court for the foreclosure of said mortgage.

In the meantime certain creditors of the said Dayton Company had filed a petition in the United States District court at Chattanooga, praying that said company be adjudged a bankrupt. This petition was sustained, and said Dayton Company was adjudged a bankrupt, and the State court, in which the general creditors' suit was pending, entered an order, transferring the personal property in the hands of the receiver of said company to the trustee in bankruptcy.

On January 18, 1916, the Central Trust Company filed a petition in the bankruptcy court, in which it set up the proceedings and adjudication in the State court with respect to said mortgage, and alleging that the value of the mortgaged property was not sufficient to pay the indebtedness secured, and praying for a foreclosure of the mortgage.

The trustee in bankruptcy resisted this petition on the ground that the mortgage was invalid, and likewise the adjudication in the State court sustaining it was challenged by said trustee on the ground that the State court had no jurisdiction of the controversy after the filing of the petition in bankruptcy. This contest is still pending in the bankrupt court at Chattanooga. It appears, however, that pending said contest over the validity of said mortgage, the property of the Dayton Company has been sold for $400,000 under an agreement that the proceeds of sale should be substituted for and stand in the place of the property itself.

In the bill filed in the instant cause it is alleged that if the mortgage is sustained the proceeds of the property will not be sufficient to pay the secured debts, and if the mortgage is held invalid the claims of the debenture holders will be of no value except as to the balance that may remain of the proceeds of the sale of the property, after paying and satisfying the Dayton Company's general creditors.

It is alleged in complainant's bill that said corporations, organized under the name of the Dayton Coal & Iron Company, Limited, in 1895 and 1897, had not complied with the foreign corporation laws of Tennessee, and that the change of corporate entity was kept secret, and none of the American creditors ever knew or heard of such change, but continued to deal with the new company, supposing they were dealing with the old one, and in ignorance of the failure of the new corporation to comply with the statutes of Tennessee, where it was doing business, relating to foreign corporations; that on September 18, 1900, the defendant Commercial Bank of Scotland had become a stockholder in said Dayton Company, and on July 7, 1905, the defendant Bank of Scotland, had likewise become a stockholder in said corporation, and both defendants had so continued down to the filing of the bill in this cause; that they were charged with notice, and knew the facts to be, that said corporation was carrying on business in Tennessee, and sanctioned the same; that it was while carrying on such business in Tennessee under the name of Dayton Coal & Iron Company, Limited, they became indebted to the respective complainants in the various amounts set out in the bill.

The bill further alleged that said defendants had no property in the State of Tennessee, except the debentures of the Dayton Company, which the bill alleged had been delivered by said banks to their attorneys in Tennessee, and were under the control of said attorneys; and that if said mortgage and debentures were held valid by the bankrupt court, and the proceeds were collected and transmitted to said defendants, complainants would be wholly without remedy.

The bill prayed for an injunction restraining said attorneys of the defendant banks from receiving or transmitting any funds belonging to their said clients; that the rights of said attorneys to a lien on said funds be settled and the amounts ascertained to be due them be paid; that complainants be given decrees for the amounts of their various claims against said defendant banks, and that such decrees be paid and satisfied out of any sum due said defendants in said general creditors' suit.

The Central Trust Company and said two banks answered the bill. In their answer they admitted the allegations of the bill with respect of the various charters of the Dayton Company, and admitted that none of them, except the charter of 1883, were registered in Tennessee, that in 1903 a mortgage was executed by the Dayton Company to the Central Trust Company as alleged by complainants, which recited, among other things, that the Dayton Company had complied with all of the requirements of the laws of Tennessee and of other States in which its properties were located, and that the Central Trust Company believed this recital to be true.

The defendant banks expressly denied that either of them ever became a stockholder or part owner in said Dayton Company, but that certain of the owners and holders of stock in said company had at various times assigned and transferred to certain designated persons as "trustees or nominees" of the respective banks various shares of stock specifically set out in the answer to secure the payment of loans or advances made to stockholders by the said banks; that none of the officers, agents or representatives of either of said banks ever participated in the management or business transactions of the said Dayton Company, and never had any interest in the same except by virtue of the deposits of stock as collateral security; and that it was represented to the officers and agents of said defendants, and they believed, that the Dayton Company had complied with the requirements of the statutes of Tennessee respecting foreign corporations; and that they did not know to the contrary until after the filing of the general creditors' bill and the institution of bankruptcy proceedings against the Dayton Company.

The answer was afterwards amended so as to aver the following:

"That neither of said defendant banks has power or authority under its charter or the laws of Great Britain, under which it was organized, to enter into any partnership contract or relation with any other person, firm or corporation."

A stipulation was entered into by counsel for the parties covering the material facts relating to the questions involved, and the cause was originally heard and deter-

mined by the chancellor upon the pleadings, this stipula-
tion, the various exhibits thereto, and the charters of the
two banks.

A statement of Samuel H. Whittaker, assistant man-
ager of the Dayton Company, as to the manner in which
the company's business was conducted, was filed as a
part of said stipulation. Mr. Whittaker stated that he
had been with the company a great many years, and was
for a number of years its manager in the United States;
that his office was in Cincinnati, where the company kept
a sales office; that it had no other property in the State
of Ohio except its office and office fixtures; that all of
the property of the company was in the State of Tennes-
see, where it had mines, furnaces, commissaries, etc;
that it owned a small amount of undeveloped land in the
State of Georgia, which was of small consequence: that
the company's business was conducted and carried on
at Dayton, Tenn., except the management of its sales
office at Cincinnati, which was kept and maintained there
as a matter of convenience for the sale of iron, which the
company was manufacturing at Dayton; that the com-
pany did a business of over $1,000,000 a year, and in car-
rying on this business it was necessary, in order to meet
the pay rolls of the company, to borrow from time to
time large sums of money; that all the debts of com-
plainants were created either for money borrowed to
meet the pay rolls at Dayton, and to enable the company
to carry on its business there, or for money advanced on
pig iron purchased at Dayton, or for freight charges on
merchandise, pig iron, and iron ore carried to and from
Dayton by the railroad company; that, in fact, the

business of the company was carried on and conducted exclusively in Tennessee.

It was also stipulated that the debts and amounts thereof, which the bill alleged was due complainants, were correctly stated in the bill; the manner in which these debts were created being set out in the stipulation.

It was further stipulated that the answer of the defendant banks with reference to the manner in which they acquired and held the stock in the Dayton Company should be treated as the depositions of the officials of the two banks.

It was further stipulated that complainants would testify, through their proper officials, that they did not know until after the failure of the Dayton Company that it had not complied with the laws of Tennessee respecting foreign corporations, and were not aware of the various charter changes of said corporation.

It was further stipulated that the officers of the defendant banks would testify to the same facts.

It was further stipulated that the printed transcript in the case of *Morgan Bros. et al.* v. *Dayton Coal & Iron Company* might be looked to and considered as evidence in this cause, in so far as relevant and material. The charter of the Dayton Company was also filed as an exhibit to the stipulation, as was also a copy of the mortgage hereinbefore referred to.

It was also stipulated that a copy of the annual summaries, giving a list of the stockholders of the Dayton Company, and filed in the bankruptcy proceedings at Chattanooga, Tenn., in Re Dayton Coal & Iron Company, Limited, might also be filed in this cause as Exhibit C to said stipulation, which the record shows was done.

The undisputed facts, with respect to the ownership of the stock introduced on the original hearing of the cause, are as follows:

The annual summaries show that with reference to the defendant Commercial Bank of Scotland there was transferred to certain nominees for it five hundred preferred shares from Alexander Donaldson on September 18, 1900; from John MacLellan one thousand preferred shares and one thousand two hundred and one ordinary shares on the same date; that on June 19, 1902, Neil MacNeil transferred to these said nominees of said bank one thousand shares of preferred stock; that on January 12, 1903, Thomas N. MacKinnon transferred to the same nominees of the bank one thousand preferred shares and eight hundred and forty-five ordinary shares; that on June 19, 1902, Alexander Donaldson transferred to the same nominees five hundred shares, making the total amount of shares held by the agents of said bank six thousand and forty-six shares.

It further appears that in the case of *Morgan Bros. et al.* v. *Dayton Coal & Iron Company* there was an issue of fact as to whether or not the stockholders and directors of the Dayton Company authorized the execution of the mortgage of date January 28, 1903.

In that case the attorneys for the defendants Commercial Bank of Scotland and the Bank of Scotland produced and filed a certified copy of the minutes of the Dayton Company, showing that on January 28, 1903, at a meeting of the stockholders of the Dayton Company in Glasgow, Scotland, the stockholders voted to authorize the execution of the mortgage in controversy.

145 Tenn.—11

It appears from the minutes of said stockholders' meeting that there were present at said meeting owners of shares numbering four thousand nine hundred and three. The minutes of said meeting further recite as follows:

"The secretary produced proxies from the Commercial Bank of Scotland, Glasgow, whose holding is six thousand and forty-six shares, in favor of Mr. Peter Donaldson and Mr. A. S. MacLellan, this making a total of ten thousand nine hundred and forty-nine, shares, valued £109,490, represented at the meeting."

The attorneys for the defendant Commercial Bank of Scotland, also filed in that case a certificate of Robert B. Langdon, secretary of the Dayton Company, which recited that the mortgage was submitted to a meeting of the stockholders of said company on January 28, 1903, "at which the owners and holders of more than one-half the amount of the stock issued by the Dayton Coal & Iron Company were present in person or by proxy."

The annual summaries show that a large part of the stock of the Dayton Company held by these agents or nominees of the defendant Commercial Bank of Scotland, that was voted in this meeting in favor of the execution of the mortgage hereinbefore referred to, continues to be held by these agents of the said bank at the present time. It also appears that the larger portion of the debentures secured by said mortgage was then and is now held by the said Commercial Bank of Scotland.

The annual summaries also show that there were transfers of stock to and from the Commercial Bank through its agents during this period, and in most in-

stances the transfers were to strangers to the original transaction. In other words, the holders of the stock were not merely retransferring to the original holders.

The annual summaries also show that in 1907, the Commercial Bank of Scotland, through its nominees, Rennie and Cameron, acquired one thousand nine hundred and fifty-one shares of stock from Wm. A. Donaldson, and later these shares were transferred to Peter Donaldson, and still later were retransferred by the administrator of Peter Donaldson to the same agents of said bank. W. P. Donaldson also transferred to the nominees of the bank seven hundred and fifty shares, None of these various transfers and retransfers are explained by the bank.

It also appears from said annual summaries that on September 18, 1900, John MacLellan transferred one thousand two hundred and one shares to said nominees of the Commercial Bank of Scotland, which shares said nominees have continued to hold to the present time. These one thousand two hundred and one shares were a part of the six thousand and forty-six shares voted in the stockholders' meeting of January 28, 1903.

With respect of the defendant Bank of Scotland the annual summaries show that on July 7, 1905, Peter Donaldson transferred to A. C. Robertson and A. Mackey, as nominees of said bank, one thousand five hundred shares of preferred stock in the Dayton Company, and four hundred and ninety-nine ordinary shares; that on the same date Alexander Donaldson transferred to the same agents for the Bank of Scotland one hundred and one shares. These shares continued to be carried in the

name of these agents of said bank until June 19, 1913, when they were transferred to John Bissett, James T. MacDonald, and Adam A. G. Johnson, who were also agents of the Bank of Scotland.

The record also shows that the Bank of Scotland, in the case of *Morgan Bros. et al.* v. *Dayton Company,* insisted that it was the absolute owner of certain of the debentures secured by said mortgage, and it was finally adjudged in that case that it was such owner, and it now claims to be the owner of said debentures.

Upon the hearing the chancellor dismissed complainants' bill as to the Bank of Scotland, being of the opinion that it was not shown by a preponderance of the evidence that it was ever a stockholder in the Dayton Company, but that such stock as it did hold in said company was held by it only as collateral security to secure advances made by it to the owners of said stock, and that therefore said bank was not liable to complainants for any of the debts sued for.

The chancellor sustained the bill as to the Commercial Bank of Scotland, and granted a recovery against said bank in favor of the complainants State of Tennessee, Cincinnati, New Orleans & Texas Pacific Railway Compay, American Credit Indemnity Company, Atlantic Ice & Coal Corporation, and Durham Coal & Iron Company for their claims. He, however, refused decrees in favor of the Bank of Montreal, the Guaranty Trust Company, the Equitable Trust Company, Tuffli Bros. Pig Iron & Coke Company, and Rogers Brown & Co. on their claims.

The chancellor was of the opinion that the business of the Dayton Company carried on in Tennessee was a part-

nership, because the company had failed to comply with the laws of the State respecting foreign corporations.

The chancellor further held that the evidence showed that the Commercial Bank of Scotland was a stockholder of the Dayton Company, and was therefore a partner in the firm. He further held that the creditors, whose debts were created upon contracts made in Tennessee, or to be performed in said State, should be treated as creditors of the partnership, and were entitled to recover against the Commercial Bank of Scotland as such, but that creditors whose debts were created upon contracts made outside of the State, or to be performed outside of the State, were not entitled to recover, because the Dayton Company was a valid corporation at the place where it was chartered, and there could be no personal liability against the stockholders because of its failure to comply with the laws of Tennessee, unless the claims sued on involved the doing of business in violation of the laws of said State.

In holding the Commercial Bank of Scotland liable upon the theory that it was a stockholder in the Dayton Company, the chancellor stated in his written opinion that as to one thousand two hundred shares of the stock standing in the names of the·nominees of said bank, the bank, in its answer, did not claim that this stock was held as collateral security, and that it was shown that the original holder of this stock had long since become a bankrupt and his affairs wound up in a bankruptcy court. The chancellor says:

"The necessary inference is that his interest in the stock was closed out, and since the stock still stands in the

name of the bank's nominees, there is the further inference, in the absence of anything to the contrary, that the bank became the absolute owner. The other stock, which the bank accounts for in its answer as held as collateral security for debts, amounted to six thousand and forty-six shares. But it appears that in 1902, whatever its real interest in the stock was, yet, by virtue of holding it, the bank was treated by the Dayton Company as a stockholder, and it accepted that *status* and acted as such. Through its proxies the bank, as a stockholder, cast the vote of these six thousand and forty-six shares in favor of the mortgage securing the debentures of the company, thereby making a majority of the stock of the corporation in favor of the resolution. A large part of these six thousand and forty-six shares the bank has continued to hold until the present time, and there is nothing to show that its *status*, rights, and privileges in respect thereto did not continue to be the same as they were in 1902.

"However, the bank did assume to act as a stockholder in the Dayton Company, and is now claiming and insisting upon the benefit of the security which it obtained by its vote as a stockholder. It is estopped, while retaining the benefit of its act, to plead *ultra vires* as a defense to the liability which the law of Tennessee imposes as the consequence of such act. I think the Commercial Bank is liable."

On May 22, 1919, the Commercial Bank of Scotland filed what is termed in the record as a "motion to remand," but which is more in the nature of a petition to rehear, which was sworn to by local counsel for the Com-

mercial Bank of Scotland. In this motion it was stated that said defendant's failure to explain its ownership of the one thousand two hundred and one shares hereinbefore referred to was an inadvertence upon its part, and that, if given an opportunity to do so, it could establish the fact to be that this stock was taken and held as collateral security only by the bank.

It was further stated in said motion with reference to the execution of the proxies and the participation of the bank in the stockholders' meeting of January 28, 1903, that any proxies given for the voting of said stock at said meeting were given in accordance with the universal practice or custom under or by which the pledgees of stock always executed proxies to the pledgors at their request, and that the proxies were used at the time referred to pursuant to this custom or practice, and, if given an opportunity to do so, the bank could show that it had nothing to do with directing the casting of the vote referred to. The motion concludes as follows:

"The holdings of said Commercial Bank were at that time, and continued to be, solely through its nominees as collateral security for indebtedness, and the execution of the proxy or proxies referred to in said minutes was pursuant to custom and the request or direction of the absolute owner or owners, which proof defendant bank is fully prepared to make beyond the possibility of question or dispute."

This motion was granted by the chancellor, and an order was made and entered, permitting further proof to be taken by said defendant on these issues.

The defendant did take the depositions of Robert Hill Lochhead and William Linton, two agents of the bank, in whose names the stock appeared as its nominees; James McKee, the secretary of the Dayton Company, and William Bamford Lang, the assistant manager of the defendant bank.

These depositions were taken upon interrogatories, and all of said witnesses were asked the same questions on original examination. With reference to the participation of the Commercial Bank in the stockholders' meeting of January 28, 1903, it appears that none of the witnesses were present.

Linton and Lochhead had been in the employ of the bank for many years—Lochhead, as agent, since June 1892, and Linton, as agent, for about forty years. They testified that they held the stock transferred to them only as agents of the defendant Commercial Bank of Scotland, and that the management of the stock was controlled by the higher officers of the bank. The witness Lang testified that he was assistant manager of the bank, and had been in its employ forty-three years, All of these witnesses testified that it was the custom of the bank that, when stock was pledged as collateral security, proxies were issued to the pledgors, at their request, to be voted by such pledgors at stockholders' meetings.

On the question of the manner in which the proxies were issued and voted at the stockholders' meeting of January 28, 1903, each of these witnesses was without knowledge. Each witness was asked to file these proxies, or copies of same, and answered that they did not have them in their possession. Each witness was asked to

file copies of the alleged pledge agreements under which said stock was said to have been pledged. This they stated they could not do, because they had no such copies in their possession.

On cross-examination the witness Lang, assistant manager of the bank, was asked with reference to the indebtedness for which the stock was pledged as follows:

"Cr. Int. 10. Please give a full statement of all indebtedness on the part of any person who has transferred any stock to the Commercial Bank of Scotland or its nominees. Give the amount of the indebtedness, the date the indebtedness was created, when same or any part thereof was paid."

He answered: "The firm of Messrs. James Watson & Co., and the partners thereof. The indebtedness to the bank at the date of the failure of Messrs. James Watson & Co., iron merchants, Glasgow, was about £150,000 sterling; part of the collateral security held against that has been already realized, but there is still a large sum due the bank, about £25,000 to £30,000 sterling."

No indebtedness was shown by the testimony of these witnesses from either Neil MacNeil, Alexander Donaldson, T. N. MacKinnon, nor John MacLellan.

With reference to the T. N. MacKinnon stock in appears from a letter treated as evidence in the cause of *Morgan Bros. et al.* v. *Dayton Company* that MacKinnon had gone into bankruptcy several years prior to 1914. No evidence whatever was introduced to explain the fact that the MacKinnon stock remained in the name of the bank after MacKinnon's bankruptcy and down to the present time.

The witnesses Lang, Linton, and Lochhead, testified that the stock of MacLellan and MacKinnon was transferred to the bank as security. They stated, however, that all they knew about it was based on information secured from the books of the bank. They declined to file the books of the bank, or copies of same, and on exception by complainants to said testimony the court excluded it. None of these witnesses were able to state of their own knowledge that the bank never became the absolute owner of such stock.

The cause was again heard by the chancellor upon the additional proof taken by the Commercial Bank of Scotland on the matters set up in its "motion to remand," and its motion was dismissed, and a decree was entered against it for the claims of those creditors whom the chancellor had originally held were entitled to recover against said bank, and also for the claim of Rogers Brown & Co., a recovery for which was originally denied, but was granted on their petition to rehear.

The chancellor, however, only allowed said complainants interest on their claims from the date of the filing of the bill, except on two notes held by the State of Tennessee, on which interest was allowed from maturity. The chancellor further decreed that the issuance of executions upon these recoveries be stayed until after the complainants' claims were credited with their *pro rata* to be received from the fund administered in the bankruptcy court.

From the decree of the chancellor the Commercial Bank of Scotland has appealed to this court, and has assigned the action of the chancellor in granting decrees

against it in favor of any of the complainants for their debts against the Dayton Company for error.

Those complainants who were denied recoveries on their claims have also appealed, and have assigned the action of the chancellor denying them relief under their bill for error.

The complainants, in whose favor recoveries were granted, excepted to the action of the chancellor declining to allow interest on their claims from maturity, and in declining to award execution, and in dismissing the bill as to the Bank of Scotland, have appealed, and have assigned errors.

We will first dispose of the assignments of eror filed on behalf of the Commercial Bank of Scotland. It is insisted by these assignments of error that the chancellor erred in holding that the Commercial Bank of Scotland was the owner of any of the stock of the Dayton Company, or that it was liable for the claims of the complainants in whose favor recoveries were granted on the ground that it was a stockholder in the Dayton Company, and was therefore liable as a partner in said enterprise for the debts of complainants, which grew out of contracts made in Tennessee, or to be performed in said State.

It has been repeatedly held by this court that foreign corporations have no right to do business in this State without first complying with the provisions of our statutes with reference to the filing of their charters, etc. If they fail to comply with these provisions, they have no standing before the courts for the enforcement of their rights, with two exceptions, which will be presently

noted. *Cary-Lombard Lumber Co.* v. *Thomas,* 92 Tenn., 587, 22 S. W., 743; *Insurance Co.* v. *Kennedy,* 96 Tenn., 711, 36 S. W., 709; *New York, etc., B. & L. Ass'n* v. *Cannon,* 99 Tenn., 344, 41 S. W., 1054; *Lumber Co.* v. *Moore,* 126 Tenn., 313, 148 S. W., 212; *Amusement Co.* v. *Albert,* 128 Tenn., 417, 161 S. W., 488.

The exceptions to this rule are *State* v. *O'Brien,* 94 Tenn., 79, 28 S. W. 311, 26 L. R. A., 252, holding that a servant of a company who has feloniously appropriated its money is estopped to defend on the ground of the company's failure to comply; the case of *Packett Company* v. *Agnew,* 132 Tenn., 265, holding that an unfaithful servant, who has made profits by use of the company's business for his own purposes, cannot defend when called to account by showing that the company had failed to comply, and the case of *State ex rel.* v. *Telephone & Telegraph Co.,* 114 Tenn., 194, 86 S. W., 390, holding that where such company had attempted to comply, but had inadvertently omitted one requirement, it would not be ousted from the State, except upon a direct suit for that purpose by the State.

It was expressly held by this court in *Cunnyngham* v. *Shelby,* 136 Tenn., 176, 188 S. W., 1147, L. R. A., 1917B, 572, that stockholders of a foreign corporation, attempting to do business as such in this State without having attempted to comply with our statutory requirements relating to foreign corporations, are liable on their contracts as partners, although such contracts are made in the name of the corporation, and notwithstanding the stockholders did not know of such noncompliance, since the corporation was without power to con-

tract, and as the stockholders could not bind it, they necessarily bound themselves.

To the same effect is the rule announced in *Taylor* v. *Branham,* 35 Fla., 297, 17 South. 552, 39 L. R. A., 362, 48 Am. St. Rep., 249; *Bigelow* v. *Gregory,* 73 Ill., 197; *Loverin* v. *McLaughlin,* 161 Ill., 417, 44 N. E., 99; *Hill* v. *Beach,* 12 N. J. Eq., 31; *Lasher* v. *Stimson,* 145 Pa., 30, 23 Atl., 552; *Guckert* v. *Hacke,* 159 Pa., 303, 28 Atl., 249.

The question in the instant cause, therefore, is: Does the evidence show that the two defendant banks were stockholders in the Dayton Company? If they were, they fall squarely within the rule announced in the cases above cited.

With reference to the Bank of Scotland, we might say at this point that we think, like the chancellor, that the evidence is insufficient to show that bank a stockholder in said corporation. The burden of proof was on complainants to show that said bank was a stockholder. The only evidence offered by complainants on this point was that the annual summaries show that certain stock of the Dayton Company appears in said summaries in the names of certain of the bank's nominees; also a cablegram of Sir William Peat, one of the liquidators of the Dayton Company, bearing date of March 31, 1914, to the effect that representatives of the bank had held shares of the Dayton Company since September, 1900. This evidence is not inconsistent with the bank's claim that its representatives held certain shares as collateral security for advances made by the bank since September, 1900. We have the testimony of the officials of the bank, stating

that said stock appearing in the names of its representatives was never held only as collateral security to secure loans made by the bank to individual shareholders in the Dayton Company.

The law is well settled that one to whom, or for whose benefit, stock is transferred merely as security for debt, and who does not appear on the stock books of the corporation as the absolute owner of the stock, is not subject to liability as a stockholder to creditors of the corporation.   Cook on Corporations (7 Ed.) section 247, p. 704; 7 R. C. L., pp. 398, 399: *Andrews* v. *National F. & P. Wks.*, 76 Fed., 166, 22 C. C. A., 110, 36 L. R. A., 139; *Sturtevant* v. *National F. & P. Wks.*, 88 Fed., 613, 32 C. C. A., 57; *Pauly* v. *State L. & T. Co.*, 165 U. S., 606, 17 Sup. Ct., 465, 41 L. Ed., 844; *Rankin* v. *Fid., etc., Co.*, 189 U. S., 242, 23 Sup. Ct., 553, 47 L. Ed., 792.

We think it is quite manifest that the proof was insufficient to fix liability on the Bank of Scotland for any of the debts of complainants, and that there is no error in the action of the chancellor dismissing the bill as to it.

With reference to the Commercial Bank of Scotland, the record presents a more serious question.   We think that, notwithstanding the testimony of the officers of that bank to the effect that it was not a stockholder in said corporation, but held certain shares in the names of its nominees as collateral security only to secure loans to the various owners of said stock, the weight of the evidence shows that it was not only a stockholder in said corporation, but that it actually participated in the affairs of the corporation as such.

The evidence clearly shows that in January, 1903, it issued to Peter Donaldson and A. S. MacLellan proxies representing six thousand and forty-six shares of stock in the Dayton Company, which stock it claims only to have held as collateral security for loans. It furthermore appears that these proxies were not issued to the alleged pledgors of said stock in accordance with the practice and custom which certain agents of the bank testified universally prevailed with the bank, but were issued to persons not shown to have any interest in said stock. The alleged pledgors of this stock were Alexander Donaldson, Neil MacNeil, John MacLellan, and Thomas N. MacKinnon; whereas the proxies were issued to Peter Donaldson and A. S. MacLellan. It is not denied by the officials of this bank that these proxies were so issued, and the record shows that these proxies voted the six thousand and forty-six shares of stock held by the bank in favor of the execution of the mortgage hereinbefore referred to at the stockholders' meeting of January 28, 1903, which mortgage was for the benefit of the Commercial Bank of Scotland. It further appears that, notwithstanding Neil MacNeil and Alexander Donaldson, two of the alleged pledgors of said stock were present at the stockholders' meeting, they did not hold proxies for any of the stock held by said bank. These facts, therefore, strongly negative the testimony of the bank's officials that said stock was held by it only as collateral security.

Furthermore, on cross-examination of Mr. Lang, the assistant manager of the Commercial Bank, he was asked to give a full statement of all indebtedness on the part of any person who had transferred stock to said bank, or its

nominees, and to give the amount of the indebtedness, the date the indebtedness was created, when the same, or any part thereof, was paid.

He answered: "The firm of Messrs. James Watson & Co. and the partners thereof. The indebtedness of the bank at the date of the failure of Messrs. James Watson & Co., iron merchants, Glasgow, was about £150,000 sterling; part of the collateral security held against that has been already realized, but there is still a large sum due the bank, about £25,000 to £30,000 sterling." It thus appears that the assistant manager of the bank does not undertake to show any indebtedness from those whom it is claimed transferred to the bank the stock held by it. No indebtedness to the bank was shown from either Neil MacNeil, Alexander Donaldson, T. N. Mac-Kinnon, or John MacLellan.

It was not claimed in the answer of the bank that the transfers were intended to secure any indebtedness of the firm of James Watson & Co. On the contrary, the answer states that the transfers were to secure advances made to the individuals hereinbefore named.

Furthermore, it appears, with respect to the T. N. Mac-Kinnon stock, that MacKinnon was adjudged a bankrupt in the bankruptcy court prior to 1914, and the presumption would be that his stock was closed out and sold in the bankruptcy proceeding. Yet, the evidence shows that the bank still claims to hold this stock as collateral security, and does not offer any explanation of why this stock was not closed out in the bankruptcy proceeding. In other words, no evidence whatever was introduced to explain the fact that the MacKinnon stock has remained in the

names of the representatives of the Commercial Bank for years after MacKinnon's bankruptcy.

It was to enable the bank to explain all of these matters that the chancellor remanded the cause for further proof; it being stated in the bank's motion to remand that it could establish by proof beyond dispute, if given an opportunity to do so, that its holdings of stock in the Dayton Company were never held except as collateral security for advances made, and that the proxies referred to in the minutes of the Dayton Company were issued pursuant to custom at the request or direction of the absolute owner or owners of said stock.

None of the alleged pledgors were called to testify by the bank with reference to its holdings of said stock or to explain the manner and on what account they were held. None of the agents or officers of the bank, whose depositions were taken on the motion to remand, claim knowledge of these matters. It certainly devolved on the bank to explain the many cogent facts and circumstances which tend to show that its holdings of stock in the Dayton Company were not that of mere pledgee, but were that of a stockholder. It offers no explanation whatever of why the proxies issued for the six thousand and forty-six shares in January, 1903, and which were voted in favor of the execution of the mortgage at the stockholders' meeting of January 28, 1903, were issued to Peter Donaldson and A. S. MacLellan, and not to the alleged pledgors of said stock in accordance with the practice and custom which the bank says universally prevailed. It certainly was within the power of the bank to explain that transaction. No witness is introduced to show the manner in

which these proxies were voted at the stockholders' meeting of January 28, 1903. No explanation is given why the bank has continued to hold a large portion of this stock from 1900 down to the present time.

It results, therefore, that we think that, notwithstanding the testimony of this bank's officials, the weight of the evidence shows that it was a stockholder in said corporation, and that it actually participated as such in the affairs of the corporation.

It is next insisted that the chancellor erred in sustaining the objections of complainants to the testimony of the witnesses Lochhead, Lang and Linton relating to certain information which they claimed to have acquired from an examination of the books of the bank. This evidence was excluded on the idea that the books of the bank would be the best evidence of the facts about which the witnesses offered to testify.

We think this testimony was properly excluded, because the books of the bank were not produced and tendered to complainants for their examination, and they were afforded no opportunity to cross-examine said witnesses as to matters or entries appearing on the books of the bank.

It is next insisted that the chancellor erred in adjudging that the Commercial Bank of Scotland was liable for the claim of Rogers Brown & Co. under the amendment filed to complainants' original bill.

This claim was for money paid by Rogers Brown & Co. in Cincinnati, Ohio, to the Dayton Company for pig iron which said company contracted to stack on its yards at Dayton, Tenn., subject to the orders of Rogers Brown

& Co. This contract was made and the money paid only a short time before the failure of the Dayton Company in June 1913. When said company failed it developed that said pig iron, which was stacked by the Dayton Company on its yards, had been converted by it and used for other purposes, and therefore Rogers Brown & Co. did not receive this iron.

The chancellor decreed a recovery on this claim upon the idea that the contract out of which it grew was a Tennessee contract, the evidence showing that it was the intention of said parties that said contract was to be performed in Tennessee.

In *Hall* v. *Cordell,* 142 U. S. 116, 12 Sup. Ct., 154, 35 L. Ed., 956, it was said: But where there is nothing to show "that the parties had in view, in respect to the execution of the contract, any other law than the law of the place of performance, that law . . . must determine the rights of the parties."

In 2 Pars. Cont. 586, it is said: "So if one in New York orders goods from Boston, either by carrier whom he points out, or in the usual course of trade, this would be a completion in the making of the contract, and it would be a Boston contract, whether he gave no note, or a note payable in Boston, or one without express place of payment."

Mr. Tiedeman, in his work on Commercial Paper, says: "It is not the law of the place where the contract was signed or executed, but the law of the place where the contract was consummated, by delivery or otherwise, which governs the construction of the contract made in one State, to be performed in another. Thus notes

drawn in one State, and delivered and payable in another, for purchases made there, are governed by the law of the latter State, and are considered there made; for by delivery only the act of making is fully consummated.''

In *Hubble* v. *Morristown Land Co.*, 95 Tenn., 585, 32 S. W., 965, it was held that a note secured by a mortgage on Tennessee land, for a loan negotiated in Connecticut, and executed in North Carolina, but delivered and made payable in New Jersey, is, in the absence of a contrary understanding between the parties, governed by the laws of New Jersey in respect to usury.

In *Neal* v. *New Orleans, etc., Asso.*, 100 Tenn., 607, 46 S. W., 755, it was held that a contract for the loan of money by a building and loan association, having no office or agency in this State, made direct from its home office in Louisiana, to be secured by a mortgage on land in Tennessee, the loan in each installment note thereon being payable in the former State, was a Louisiana contract, and that the statutes of Tennessee, requiring foreign corporations to register their charters as a condition of doing business or holding property in the State, did not apply.

In view of these authorities, we are of the opinion that there was no error in the action of the chancellor awarding a recovery in favor of Rogers Brown & Co.

And the same is true of the action of the chancellor in allowing the complainants Cincinnati, New Orleans & Texas Pacific Railway Company and American Credit Indemnity Company recoveries on their claims. These claims were for freight charges on iron ore shipped to the Dayton Company from points in Georgia to be

delivered to said compay in Dayton, Tenn.; a portion of said claims being held by the American Credit Indemnity Company as the assignee of the Cincinnati, New Orleans & Texas Pacific Railway Company. These shipments were delivered to the railroad company at points in Georgia for transportation and delivery to the Dayton Company in Tennessee, and the freight charges on said shipments were payable in Tennessee.

. It is next insisted that the chancellor erred in not holding that complainants were estopped, by reason of their dealings with the Dayton Company as a corporation, to deny its corporate existence and assert liability against its stockholders, as partners or otherwise.

This question was ruled directly against the contention of the defendant bank in *Cunnyngham v. Shelby,* supra. In that case the court said:

"The fact that defendant in error dealt with them [stockholders] in their corporate name can avail them nothing"—citing *Harrill* v. *Davis,* 168 Fed., 187, 94 C. C. A., 47, 22 L. R. A. (N. S.), 1153; *Empire Mills* v. *Alston Grocery Co.* (Tex. App.), 15 S. W., 505, 12 L. R. A., 366.

Now, taking up the assignments of error of those complainants who were denied recoveries by the chancellor on their claims, to wit: The Equitable Trust Company; the Guaranty Trust Company and Charles W. Hill, trustee; the Fifth-Third National Bank; the Bank of Montreal; and Tuffli Bros. Pig Iron & Coke Company.

It is shown that the claims of all of these complainants, except Tuffli Bros. Pig Iron & Coke Company, were for advances made by said complainants to the Dayton Company in either New York, Cincinnati, or St. Louis; some

of them being upon drafts drawn by the company from Glasgow, Scotland. This money was used in the prosecution of the company's business at Dayton, Tenn. This fact, however, does not make these transactions Tennessee contracts. These loans or advances were negotiated by the company outside of Tennessee, and were payable where negotiated. These were certainly not Tennessee contracts.

In 19 Cyc. 1276, it is said: "Such statutes (statutes making it unlawful for a foreign corporation to do business in a State without complying with its statutory requirements) are not generally allowed to operate so as to impose any restraint upon the making and taking of contracts the *situs* of which is outside the State enacting the statute; and this for two reasons: (1) To allow them to have such an operation would give them an extraterritorial effect beyond the limits of the principle of interstate comity; and (2) it would also, in most cases, interfere with the operations of interstate commerce."

In the note to the text many cases are cited from various States in support of the rule announced.

To the same effect is the rule announced in 12 R. C. L. section 50. It is there said:

"In many cases the doctrine has been enunciated that, even though a corporation enters into a contract relating to property situated within a State, it is not doing business therein if the contract is consummated outside of the State, and hence is not required to comply with, nor is it bound by, the statutory regulations or restrictions generally applicable to foreign corporations attempting to do business therein, it being determined that such stat-

utes were not intended to affect such cases, nor to change the rules of comity that have always been observed by the courts of the several States."

The claim of Tuffli Bros. Pig Iron & Coke Company was for money advanced the Dayton Company in St. Louis, Mo., in the purchase of pig iron from said company under a contract providing that said pig iron was to be stacked by the Dayton Company on its yards at Dayton, Tenn., subject to the orders of said Tuffli Bros. Pig Iron & Coke Company. This contract was made and money paid by Tuffli Bros. Pig Iron & Coke Company on June 18, 1912, and in August, 1912, in St. Louis, Mo. Upon the failure of the company in 1913, it was found that a part of this pig iron so contracted for and paid for had been used by the Dayton Company for other purposes, and that Tuffli Bros. Pig Iron & Coke Company never received the same.

We think that Tuffli Bros. Pig Iron & Coke Company was entitled to recover upon their claim for the same reason hereinbefore stated by us in sustaining the recovery awarded in favor of Rogers Brown & Co., and that the chancellor was in error in not awarding a recovery on said claim.

It is next insisted that the chancellor erred in not awarding executions in favor of those complainants on whose claims recoveries were decreed, and in staying executions on said recoveries until the amounts to be received by said complainants in the bankruptcy proceeding are ascertained and credited; it appearing that said complainants have filed their claims against the corporation in the bankruptcy court.

On the question of awarding executions on the recoveries decreed the chancellor, in his opinion, says:

"But it appears that the assets of the Dayton Company are being administered in bankruptcy and these complainants have filed their claims therein for allowance. If the bank paid the said judgments, it would be entitled to be subrogated to the complainants in that proceeding and receive the dividends or payments which they would have received. To avoid circuity, if for no other reason, satisfaction of the judgments herein by enforcement of the attachment or otherwise will be stayed until the amounts received by complainants in the bankruptcy proceeding are ascertained and credited."

We think the action of the chancellor in staying the issuance of executions on said recoveries was error. The fact that one partner may be required to pay a debt of the firm does not entitle such partner to be subrogated to the rights of the creditor whose debt he has paid. The member of the firm paying the debt is entitled to contribution from his copartners, and he is entitled to have such of the assets of the firm applied to the payment of his claim as are not necessary to pay the remaining debts of the firm, but he cannot come in and prorate with the other creditors of the firm. 30 Cyc. 542; Rowley on Law of Partnership, vol. 1, section 497; *Ryerson & Son* v. *Shaw,* 277 Ill., 524, 115 N. E., 650.

It is next and finally insisted by complainants in whose favor recoveries were decreed by the chancellor that he committed error in not awarding them interest on their claims from the date of maturity.

The chancellor allowed interest on these claims only from the date of the filing of the bill, except two notes due the State of Tennessee. We think the allowance of interest was a matter within the sound discretion of the chancellor. Said claims were not represented by bills single, bonds, notes, bills of exchange, or liquidated and settled accounts, signed by the Dayton Company, and therefore did not bear interest as a matter of law from the date of their maturity. Shannon's Annotated Code, section 3494; Gibson's Suits in Chancery, section 563; *Knights of Pythias* v. *Allen,* 104 Tenn., 633, 58 S. W., 241; *Railroad* v. *Fort,* 112 Tenn., 455, 80 S. W., 429; *Gibson County* v. *Rains,* 11 Lea, 24; *Davidson County* v. *Olwill,* 4 Lea, 34.

The decree of the chancellor will be modified in the two particulars indicated in this opinion. In all other respects his decree is affirmed, with costs against the defendant, Commercial Bank of Scotland.

RESPONSE TO PETITION TO REHEAR.

The Commercial Bank of Scotland has filed a petition to rehear in this cause. It presents two questions, viz.:

First. It is insisted that complainants are judicially estopped in the present action because they filed their claims against the Dayton Company as a corporation in the bankruptcy court, and also sought to enforce their claims in the general creditor's suit filed in the State court at Dayton by *Morgan Bros. et al.* v. *Dayton Company et al.*

Second. It is alleged that the court erred in allowing recoveries on the claims of Rogers Brown & Co., Tuffli

Bros., Cincinnati, New Orleans & Texas Pacific Railway Company, and the American Credit Company.

The second question was elaborately presented in the original brief of counsel for defendant, and was fully discussed by the court in its opinion. Nothing new on this question is presented in the petition to rehear. No reason is presented which convinces the court that its holding with reference to these matters was erroneous. Therefore the petition on the second question will be denied.

As to the first question the petition of defendant states as follows:

"The defense of judicial estoppel was not specially urged on the prior hearing of the cause for the reason that counsel for defendants were of the opinion that the other defenses set up and argued at length were conclusive, and this defense is not considered in the opinion of the court. The defense is, however, specifically set up and relied on in the answer and is covered by the tenth assignment of error on behalf of the defendants in this court."

It is the insistence of defendant bank that by these legal proceedings instituted—one in the State court and the other in the bankruptcy court—against the Dayton Company as a corporation, complainants are judicially estopped from now contending in the present action that the Dayton Company was not a corporation, but simply a partnership or voluntary association. It is said that this is true because, notwithstanding the illegality of the contracts of the Dayton Company made in Tennessee, the other parties to such contracts had the right to enforce

and recover on them against the Dayton Company as a corporation, and complainants having sought to enforce and recover on their contracts with the Dayton Company as a corporation, both in the suit of *Morgan Bros. et al. v. Dayton Company et al.*, and in the bankruptcy proceeding, they cannot now in this suit assert that said contracts were not made by the Dayton Company as a corporation, but by its stockholders as partners. That this is true because the right to proceed against the corporation and the right to proceed against its stockholders as partners are not cumulative, but alternative, and that the election to pursue and enforce the one right operates as an estoppel against the pursuit and enforcement of the other. To support this contention defendant cites *Shoun v. Armstrong* (Tenn., Ch. App.), 59 S. W., 790; *Stearns, etc., Co. v. Jamestown R. Co.*, 141 Tenn., 203, 208 S. W., 334; and *Grizzard v. Fite*, 137 Tenn., 103, 191 S. W., 969, L. R. A., 1917D, 652.

The principle announced in those cases is simply this: That where two or more inconsistent remedies are given which depend on inconsistent facts, and which necessarily result in a suitor assuming a position inconsistent with the position which he must afterwards assume to prosecute the alternative remedy, an election, deliberately made with full knowledge of the facts and without fraud or imposition on the part of his adversary, works a judicial estoppel against him, because courts will not permit suitors to solemnly affirm that a given state of facts exists from which they are entitled to particular relief, and then afterwards affirm, or assume, that a contrary or different state of facts exists from which they are entitled to inconsistent relief.

It is necessary, therefore, to determine whether or not complainants, in the proceedings referred to, alleged and relied on a state of facts inconsistent with the facts alleged and relied on by them in this cause, and whether or not they sought relief inconsistent with that sought and granted in the present action.

In the cause of *Morgan Bros. et al.* v. *Dayton Company et al.* the complainants alleged that the Dayton Company of 1897 did not comply with the laws of this State respecting foreign corporations. In other words, it was alleged by complainants in that suit that the Dayton Company was a corporation chartered and organized under the laws of Great Britain, and had not complied with the foreign corporation laws of Tennessee, and was not therefore authorized under the laws of said State to do business therein. It was further alleged in that suit that the Dayton Company had no right to make contracts in Tennessee. It must therefore be admitted that the facts alleged by complainants in the cause of *Morgan Bros. et al.* v. *Dayton Company et al.,* were the same as are set up in the present suit. It must further be admitted that these facts show the Dayton Company, in Tennessee, to be a mere partnership under the holding of this court in *Cunnyngham* v. *Shelby,* 136 Tenn., 176, 188 S. W., 114, L. R. A., 1917B, 572, and the other authorities cited by the court in that opinion and in the opinion in the suit at bar. It does not appear that facts were stated or alleged by complainants in the bankruptcy proceeding different from those stated in the cause of *Morgan Bros. et al.* v. *Dayton Company et al.* and in the suit at bar. Nor is the relief sought in the present action inconsistent

with that sought in the general creditors' suit and in the bankruptcy proceeding.

All of the assets of the Dayton Company were liable for its debts regardless of whether it be called a corporation or a partnership, and either the State court or the bankruptcy court would have the right to distribute its assets among its creditors under proper proceedings. Its *status* and the *status* of its stockholders is correctly described by stating the facts, as held in *Cunnyngham* v. *Shelby,* supra. In that case the warrant, instead of describing the defendants as partners, described them as stockholders in a foreign corporation not authorized to do business in the State of Tennessee, and summoned the defendants to answer in an action by account for labor rendered. The question was made in that case by defendants that they were not sued as partners, but as stockholders of a foreign corporation, and therefore the suit could not be maintained. This court, in answering that contention, said:

"This is very meager, it is true, but it sufficiently notified the plaintiffs in error of the grounds on which they were to be held liable; that is, for transacting business in Tennessee under the name of a foreign corporation without having complied with the laws authorizing such transaction of business, such business, of course, implying an effort to obtain profit. This was using the definition for the name. The plaintiffs in error, when so summoned, could not misunderstand what they were called upon to defend. . . ."

The Dayton Company, under the laws of Tennessee, was a partnership, and its assets were that of a partner-

ship; and complainants, as creditors of said partnership, had the right to participate in the distribution of its assets without waiving their right to hold the members of the firm personally liable, and the fact that complainants sought to have their claims enforced in the suit of *Morgan Bros. et al.* v. *Dayton Company et al.*, and are seeking to participate in the distribution of the assets of said company, which are now being wound up in the bankruptcy court, does not estop them from suing the defendant, who, it is held, was a member of the firm. In the former proceedings complainants alleged substantially the same state of facts as are alleged in the suit at bar. The effect of the facts alleged was to show that the Dayton Company, in so far as the laws of Tennessee were concerned, and as to Tennessee creditors, was a partnership, and the fact that they sought to have their claims satisfied out of the company's assets does not estop them from proceeding against the members of the firm. We do not think there is any inconsistency in the two rights or remedies. They are both based upon consistent facts, and seek substantially the same relief.

The petition to rehear is therefore denied.