[Cite as *State v. Drescher*, 2016-Ohio-403.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | Hon. William B. Hoffman, J.<br>Hon. John W. Wise, J. |
| -vs- | Case No. 2015CA00020 |
| ALEX DRESCHER | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:          Appeal from the Stark County Court of
                                                          Common Pleas, Case No. 2014CR1238(A)


JUDGMENT:                                       Affirmed


DATE OF JUDGMENT ENTRY:          February 2, 2016


APPEARANCES:


For Plaintiff-Appellee                          For Defendant-Appellant


JOHN D. FERRRERO                          DONOVAN HILL
Prosecuting Attorney                          116 Cleveland Ave. North, Suite 808
Stark County, Ohio                              Canton, Ohio 44702

By: RENEE WATSON
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza, South – Suite 510
Canton, Ohio 44702-1413

*Hoffman, J.*

{¶1}   Defendant-appellant Alex Drescher appeals his convictions entered by the Stark County Court of Common Pleas on complicity to murder, complicity to felonious assault and complicity to tampering with evidence.  Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}   On the evening of July 24, 2014, and into the early morning hours of July 25, 2014, Appellant visited Gatsby's Bar with X'Avire Cobb. Zebulum Schoolcraft, Dino Crawford and James Delgado were also at Gatsby's Bar.  At the time Gatsby's Bar closed, the five left and got into a car driven by Schoolcraft.  Everyone in the car was high and/ or drunk.

{¶3}   Appellant was dropped off at a house, and Schoolcraft, Cobb, Crawford and Delgado proceeded in the car without him.  Schoolcraft subsequently lost control of the car and crashed into a utility pole. As a result of the crash, X'Avire Cobb, who was seated in the backseat and unrestrained, hit his mouth and chipped and/or loosened a front tooth.

{¶4}   After the accident, Schoolcraft, Cobb, Crawford and Delgado all took off running in separate directions to avoid being arrested.  Cobb, who was upset about his tooth, went looking for Schoolcraft. Cobb asked Appellant to help him seek out Schoolcraft through the use of Facebook and to set up a meeting for a fight.

{¶5}   Schoolcraft received messages via Facebook about the accident, and a fight was arranged at "Shakes", an area ice cream parlor and meeting place.

{¶6}   Dino Crawford testified at trial relative to the events of the evening/morning, including the meeting at "Shakes" and the incident leading up the shooting.  He stated he observed Appellant pull a gun from his side, wave it around, point it at Crawford and

Schoolcraft, and offer it to Cobb. He testified Appellant urged Cobb during the fight to shoot Schoolcraft. Cobb then fired seven shots at Schoolcraft, ending his life.

**{¶7}** Testimony at trial also established Appellant later brokered a trade of the murder weapon for another firearm in the days following the shooting.

**{¶8}** The Stark County Grand Jury indicted Appellant on charges of complicity to murder, in violation of R.C. 2923.03(A)(2) and R.C. 2903.02(B); complicity to felonious assault, in violation of R.C. 2923.03(A)(2) and R.C. 2903.11(A)(1)/(A)(2); and complicity to tampering with evidence, in violation of R.C. 2923.03(A)(2) and R.C. 2921.12(A)(1). Both the murder and felonious assault charges carried attendant firearm specifications in violation of R.C. 2941.145.

**{¶9}** Following a jury trial, Appellant was convicted on all counts. On January 28, 2015, Appellant was sentenced to a total of twenty-one years to life imprisonment.

**{¶10}** Appellant appeals, assigning as error:

**{¶11}** I. APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

**{¶12}** II. APPELLANT WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE COURT OVERRULED APPELLANT'S MOTION FOR A MISTRIAL AFTER THE JURY WAS MADE AWARE OF APPELLANT'S INCARCERATION.

I.

**{¶13}** In the first assignment of error, Appellant maintains his convictions are against the manifest weight and sufficiency of the evidence.

**{¶14}** The Supreme Court has explained the distinction between claims of sufficiency of the evidence and manifest weight. Sufficiency of the evidence is a question

for the trial court to determine whether the State has met its burden to produce evidence on each element of the crime charged, sufficient for the matter to be submitted to the jury.

{¶15} Manifest weight of the evidence claims concern the amount of evidence offered in support of one side of the case, and is a jury question. We must determine whether the jury, in interpreting the facts, so lost its way that its verdict results in a manifest miscarriage of justice, *State v. Thompkins* (1997), 78 Ohio St.3d 387, citations deleted. On review for manifest weight, a reviewing court is "to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, syllabus 1.

{¶16} The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.

The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶17} Specifically, Appellant maintains his convictions are unreliable in that they are based upon contradictory testimony, biased and impaired witnesses and insufficient evidence. In *State v. Cobb*, Stark App. No. 2014CA00218, 2015-Ohio-3661, this Court held,

A fundamental premise of our criminal trial system is that 'the *jury* is the lie detector.' *United States v. Barnard,* 490 F.2d 907, 912 (C.A.9 1973) (emphasis added), cert. denied, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). Determining the weight and credibility of witness testimony, therefore, has long been held to be the 'part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.' *Aetna Life Ins. Co. v. Ward,* 140 U.S. 76, 88, 11 S .Ct. 720, 724–725, 35 L.Ed. 371 (1891)". *United States v. Scheffer* (1997), 523 U.S. 303, 313, 118 S.Ct. 1261, 1266–1267.

The jury was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence". *State v. Craig* (Mar. 23, 2000), Franklin App. No. 99AP–739, citing *State v. Nivens* (May

28, 1996), Franklin App. No. 95APA09–1236 Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver,* Franklin App. No. 02AP–604, 2003–Ohio–958, at ¶ 21, citing *State v. Antill* (1964), 176 Ohio St. 61, 67, 197 N.E.2d 548.; *State v. Burke,* Franklin App. No. 02AP1238, 2003–Ohio–2889, citing *State v. Caldwell* (1992), 79 Ohio App.3d 667, 607 N.E.2d 1096.

**{¶18}** Appellant was convicted of complicity to murder, complicity to felonious assault and complicity to tampering with evidence for soliciting, procuring, aiding or abetting another in committing the offenses. To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime. *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796, 2001-Ohio-1336.

**{¶19}** Officer Bill Adams of the Canton Police Department testified at trial he identified Appellant through the use of Facebook, and through his interview with Dino Crawford following the shooting.

**{¶20}** Dino Crawford testified at trial, on cross-examination,

Q. And Alex [Appellant] and X [Cobb] show up for a fight, Zeb [Schoolcraft] meets them - -

A. Yeah, but somebody brought a gun.

Q. Yeah, that's right, and Zeb [Schoolcraft] winds up getting shot. That wasn't the point, though, right?

A. I couldn't tell you. Usually when someone brings a gun, that could be the point very easily, right?

Q. Okay. You say that Alex [Appellant] pulls the gun out and starts waving it around?

A. Waving it around, pointing it at us, asked me if I wanted hit too. Obviously I'm not going to try to fight somebody when they got a gun pointed at me, right?

Q. Yeah, but Zeb [Schoolcraft] did. Why didn't you guys just leave?

A. I don't know. I guess - - I guess we're not little girls, I don't know.

Q. I mean - -

A. I wish we would have.

* * *

Q. Again, you show up for a fight, somebody brings a gun to a fight, you see it first thing, right?

A. Yeah.

Q. Why didn't you go at that point?

A. I couldn't tell you that.

Q. Okay. But it didn't stop them from squaring up, right? Zeb [Schoolcraft] and X [Cobb] still squared up?

A. No, I'm pretty sure Lexx [Appellant] was telling them to square up.

Q. He wasn't telling Zeb [Schoolcraft] or you to square up, right? I mean, it's not like somebody put a gun to your head - -

A. No, he was telling X'Avire [Cobb].

Q. Okay. And they fought, right?

A. I wouldn't say so. They squared up, ain't nobody get hit.

Q. They didn't throw any blows?

A. They probably threw a couple punches, but X'Avire [Cobb] kept backing up so nobody got punched.

Q. Okay. Did they even get to a point where they were standing - -

A. Before they - -

Q. - - face-to-face talking about X's [Cobb's] tooth?

A. Yeah, and Zeb [Schoolcraft] tried to apologize.

Q. What did X [Cobb] say?

A. Obviously he didn't take the apology.

Q. And how did Zeb [Schoolcraft] react to that?

A. I don't know. They started arguing again, started arguing with Lexx [Appellant]. Lexx [Appellant] started saying he was from the northwest, and blah, blah, blah, that's how the argument got to a bigger - -

Q. Who started to say they were from the northwest?

A. Lexx [Appellant] started saying Zeb [Schoolcraft] was from the northwest.

Q. Okay. That pissed him off?

A. Yes, sir.

Q. Pissed you off?

A. No, I didn't really care. I thought it was kind of corny.

Q. And all this time you're jawing with a guy who's waving a gun around?

A. Yeah, I was telling him to put it down. I know him. I thought - - I thought maybe I could talk some sense into him.

Q. At some point they start to walk back; is that true?

A. Zeb [Schoolcraft] started - -

Q. They started to walk away from you and Zeb [Schoolcraft]?

A. No.

Q. No?

A. No, I don't remember ever seeing that.

Q. Okay. And at some point does Zeb [Schoolcraft] charge at X [Cobb]?

A. No.

Q. What prompted - -

A. Zeb [Schoolcraft] went to leave - -

Q. What prompted - -

A.- - and then X'Avire [Cobb] asked for the gun at the end of the situation, after Lexx [Appellant] already offered it to him a couple times. And I told Lexx [Appellant] to put the gun down, and he didn't give it to him because of me.

Q. What did Zeb [Schoolcraft] say when he saw X [Cobb] with the gun?

A. I mean it was a matter of a second.  He put his arms up and said, fuck it, shoot me.  Nobody charged anybody.

Q. That's when X [Cobb] shot?

A. Yeah.

Q. When was Alex [Appellant] running?

A. He handed him the gun and said, fuck it, shoot him, and took off running immediately.

Q. Is that the story you told the police the next morning or that night?

A. Yeah, it was that night?

Q. Okay.  Do you blame Alex [Appellant]?

A. Yeah, I believe if Alex [Appellant] wouldn't have brought a gun, my friend would still be here.

Tr. at 150-157.

**{¶21}** Appellant argues the testimony offered by the witnesses presented by the State at trial was biased and inconsistent.  Specifically, Appellant cites the testimony of Jason Smith as inconsistent with the testimony offered by Crawford.  Smith testified at trial, while he was incarcerated with Appellant, Appellant told him of the murder of Schoolcraft and related he had told Cobb, "You got to shoot that nigga before he shoots you." Tr. at 267. Appellant told Smith he then handed Cobb the gun.  Tr. at 267. Smith testified Appellant told him he hit Crawford over the head as Crawford was the only person who could identify him.  Tr. at 267-268. Smith testified Appellant had further described the firearm to Smith.  Tr. at 267. Appellant argues Smith's testimony was offered as a result of a plea deal; therefore, biased.  Appellant further maintains the testimony is in

contrast to the statements testified to by Crawford, as the testimony of Crawford never claimed Appellant hit him.

{¶22} Upon review, we do not find Smith's statements contradictory to the evidence presented at trial. While there was no evidence offered Appellant hit Crawford over the head, Smith's testimony was offered to corroborate the testimony of Robert Pryor and Dino Crawford regarding Appellant's incitement of Cobb to shoot Schoolcraft and of Appellant providing Cobb with the murder weapon. Smith testified Appellant told him he provided Cobb with the murder weapon and Appellant told Cobb to shoot Schoolcraft.

{¶23} Further, Appellant argues the testimony of Robert Pryor, a neighbor who witnessed the incident from his window, is in contrast to the testimony of Dino Crawford. Pryor testified his dog started barking on the night of the incident and he could see the incident from his home window. He testified to the events of the evening as he observed them. Tr. at 169. He could hear arguing back and forth, and someone state, "Pop this fucking nigger." Tr. at 169. He testified he then saw a gun flash.

{¶24} Appellant cites Pryor's testimony, "I don't even think they got to the point of where they fought. Honestly, I don't remember seeing swinging. I think the gun came out, he shot him before they actually went to blows." Tr. at 176. Appellant maintains the testimony is inconsistent with Crawford's testimony, the shooting happened after the fight. However, upon review of Crawford's testimony, he states, "they probably threw a couple of punches, but nobody got punched." He describes the incident as more of a "squaring up." Therefore, we do not find the testimony inherently contradictory, and the jury was free to accept all or any part of Pryor and Crawford's testimony.

{¶25} Appellant further cites the testimony of Emily Smith as evidence Cobb, not Appellant, brought the gun to the fight. Emily Smith testified at trial she and Ashleigh Brown picked Appellant and Cobb up after the fight. Tr. at 193. She testified Appellant later told her Cobb had shot someone, and Appellant told her he had given Cobb the gun. Tr. at 194. She learned of the shooting later on Facebook.     Tr. at 195.

{¶26} Dino Crawford testified at trial as to Appellant's involvement on Facebook leading up to the fight and his presence at the incident.  He further testified as to Appellant having a gun at the fight and waving it around, offering it to Cobb.  He stated Appellant incited Cobb to shoot Schoolcraft. This is further supported by the testimony of both Pryor and Jason Smith.  Emily Smith testified Appellant himself testified he provided the gun to Cobb.  Accordingly, the evidence provided at trial is sufficient to prove each and every element of complicity to murder and complicity to felonious assault.  We find the jury did not lose its way in convicting Appellant herein.

{¶27} Appellant was also convicted of complicity to tampering with evidence, in violation of R.C. 2921.12(A)(1). Anwar Shelton testified at trial Appellant approached him regarding a gun his friend had to trade, and he traded him another firearm for the gun. Tr. at 232.  The trade happened a day or two after the shooting.  Tr. at 233. Appellant was at the trade with Cobb, and the firearm traded later proved to be the murder weapon. Tr. at 234.  Again, the evidence is sufficient to support Appellant's conviction on complicity to tampering with evidence, and the jury did not lose its way in convicting Appellant of the same.

{¶28} The first assignment of error is overruled.

II.

**{¶29}** In the second assignment of error, Appellant maintains the trial court erred in denying his motion for a mistrial after the jury was made aware of Appellant's incarceration.

**{¶30}** Specifically, Appellant cites the testimony of Jason Smith, during which Smith testified he was incarcerated with Appellant.

**{¶31}** At trial, the following exchange occurred on the record,

Q. And you know Alex Drescher?

A. Not on the - - like, when we were free. I met him in the county jail when we was down in the hole.

Q. And you met him sometime in October or - -

A. Yes.

MR. CAZANTZES: Objection, Your Honor, may we approach?

THE COURT: Yeah, please.

------------

(A conference was held at the bench outside the hearing of the jury.)

MR. CAZANTZES: Your Honor, unfortunately, the cat is out of the bag. The point that he -- I'll move to strike that last statement. For the record, I'm going to move for a mistrial on the basis that he has indicated to the jury that the Defendant is an inmate at the Stark County Jail and was in the hole. So he must have done something to get into that. He does have a constitutional right to not have the jury know that he is currently incarcerated. That information in and of itself could be prejudicial.

THE COURT: Well, here's where I'm at.   Number one, I'll give a curing instruction because we heard testimony that the marshals picked him up in front of his house earlier this morning.   So I will strike that comment. I can't strike that comment because they've already heard that he's been incarcerated, but - -

MS. MLINAR: He didn't say he's currently incarcerated.

THE COURT: No, he said he was in the hole, that's what he said. Go to the next issue.   Is it going to be a statement he made to him while in jail?

MS. MLINAR: Yes.

THE COURT: How are we going to get around this issue?

MS. MLINAR: I don't know that we had - -

THE COURT: Yeah, I mean - -

MS. CAZANTZES: While it is a statement from the Defendant just to get it is going to cross that prejudicial issue of, you know, he's incarcerated and he's in the hole.

THE COURT: The cat was out of the bag this morning when he was aware that he was arrested by the marshals, okay?   So I'll give a curing instruction to this and indicate that to the jury – whether he was incarcerated at that time or not has no reflection on the case.  I mean that's all that I can do.

MR. CAZANTZES: Well, I guess - -

THE COURT: Can't give you a mistrial on this.

MS. MLINAR: But, you know, this statement comes from the jail, you've known it for—I gave it to you in October.

MR. CAZANTZES: I got it. I made my motion, he denied the motion.

***

THE COURT: Okay, ladies and gentlemen of the jury, I'll sustain the statement regarding the hole. Where the statement—or where the statement is made is not relative in this case. And we will proceed further.

So go ahead, counsel.

Tr. at 263-266.

**{¶32}** As indicated in the record, the jury was aware through another witness Appellant had been arrested by the U.S. Marshal's office and there was no objection to that testimony. The trial court sustained the objection and gave a curative instruction advising the jury the statement had no bearing on the case. Further, the evidence was cumulative evidence in support of the testimony offered by the State's other witnesses.

**{¶33}** We note, the declaration of a mistrial is an extreme remedy and the granting of a mistrial lies within the sound discretion of the trial court. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961. Accordingly, we find the trial court did not abuse its discretion herein in not granting a mistrial due to the testimony cited.

**{¶34}** The second assignment of error is overruled.

{¶35} Appellant's convictions in the Stark County Court of Common Pleas are affirmed.

By: Hoffman, J.

Gwin, P.J. and

Hoffman, J. concur